# United States Court of Appeals
## For the First Circuit

Nos. 00-1096
     00-1097
     00-1279

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

JEANNETTE SOTOMAYOR-VÁZQUEZ,
ARMANDO BOREL-BARREIRO,
YAMIL KOURÍ-PÉREZ,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Chief Judge,

Coffin, Senior Circuit Judge,

and Selya, Circuit Judge.

Francisco Rebollo-Casalduc, with whom Nachman, Guillemard &
Rebollo, were on brief, for appellant Sotomayor.
     Marlene Aponte-Cabrera, for appellant Borel.
     Benjamin S. Waxman, with whom Alan S. Ross, Robbins, Tunkey, Ross,

Amsel, Raben, Waxman & Eiglarsh, P.A., Rafael F. Castro-Lang, Castro & Castro and Fernando J. Carlo, were on brief, for appellant Kourí.

Richard A. Friedman, Appellate Section, Criminal Division, with whom Guillermo Gil, United States Attorney, María Domínguez and Edna C. Rosario, Assistant United States Attorneys, were on brief, for appellee.

---

April 30, 2001

---

**TORRUELLA, <u>Chief Judge</u>.** After a 58-day jury trial, appellants Jeannette Sotomayor-Vázquez (Sotomayor), Armando Borel-Barreiro (Borel) and Yamil Kourí-Pérez (Kourí) were convicted of various counts of conspiracy, embezzlement, money laundering and witness tampering.[1] Kourí was sentenced to 168 months imprisonment, fined $17,500, and ordered to pay $1,394,358 in restitution. Sotomayor was sentenced to 46 months imprisonment, fined $10,000, and ordered to pay $35,689 in restitution. Borel was sentenced to a year and a day of imprisonment and ordered to pay $18,777 in restitution. In these appeals, they raise numerous claims of trial error. For the reasons explained herein, we affirm the convictions in full.

### BACKGROUND

We briefly summarize the relevant facts, which we develop in greater detail where necessary.

## I. The Embezzlement Scheme

---

[1] Borel was convicted of one count of conspiracy to embezzle from an organization receiving federal funds in violation of 18 U.S.C. § 371, and two counts of embezzlement from such an organization in violation of 18 U.S.C. § 666. Sotomayor was convicted of one count of conspiracy, three counts of embezzlement, and one count of witness tampering in violation of 18 U.S.C. § 1512(b). Kourí was convicted of one count of conspiracy, two counts of embezzlement, and 24 counts of money laundering in violation of 18 U.S.C. § 1956(a).

A number of other co-conspirators were also indicted, and were either tried separately or pled guilty pursuant to agreements with the U.S. Attorney.

Advanced Community Health Services, Inc. (ACHS) treated persons with AIDS from 1987 to 1994 pursuant to a contract with the City of San Juan, Puerto Rico. From 1990 to 1994, ACHS was a non-profit organization eligible for federal funding, of which it received approximately $15,000,000.

Appellant Kourí was an employee of the Harvard Institute for International Development (HIID). Although Kourí was not officially an employee of ACHS, the Government introduced evidence as to his participation in the development of ACHS and its subsidiary, the AIDS Institute. The evidence showed that he was essentially the director, manager, and representative of those institutions. Appellant Sotomayor was employed as the Operations Manager of ACHS. Appellant Borel was employed by ACHS as a property custodian. He was also the incorporator and purchasing agent of Octagon Corporation (Octagon), one of the outside entities used to divert funds from ACHS.

The principal prosecution witness was co-conspirator Angel Corcino, who had served as the comptroller of ACHS. Corcino explained that Kourí and Sotomayor had diverted funds from ACHS by directing Corcino to make checks payable either to organizations controlled by Kourí[2] or to individuals associated with ACHS (who were never told that

---

[2] These organizations included Advanced Food Services, Octagon, Fundación Panamericana and Medservices.

checks were made in their names).[3] Kourí and Sotomayor would cash the checks for personal use or to make political contributions. Corcino also testified as to Borel's more limited involvement in the embezzlement.[4]

## II. Recantation of a Key Defense Witness

Kourí's defense sought to establish that the payments to Fundación Panamericana and Medservices had been made in exchange for bona fide services, and that the two companies were not shell organizations used to launder money. To this end, Kourí called Dr. Gloria Ornelas (the director of Fundación Panamericana), who testified that Panamericana had engaged in legitimate research activity, and had been paid for that activity by ACHS.

---

[3] Corcino testified that Kourí had cashed over $250,000 in checks to provide political contributions (Count 2), that Kourí had received $27,750 in other check proceeds (Count 7), and that Kourí had caused ACHS to make payments on sham, post-dated contracts through Fundación Panamericana and Medservices (Counts 9-20), the proceeds of which would later be remitted to Kourí. To avoid discovery, Corcino would send cashier's checks, which would not be returned to ACHS with fraudulent endorsements.

Corcino also testified that Sotomayor had diverted $21,000 to pay her housekeeper's salary (Count 4) and $45,000 to pay for the construction of a co-conspirator's house (Count 6), as well as helping Kourí with the embezzlement of the $27,750 (Count 7). Sotomayor was also indicted for one count of witness tampering, in connection with an attempt to convince her housekeeper to testify falsely about her duties.

[4] Corcino testified that Borel had been the maker and payee of $50,000 worth of checks funneled from ACHS through Octagon and Advanced Food Service. Several of the checks were cashed by Borel, with the proceeds ultimately paid to Kourí.

The Government later called Ornelas as its first rebuttal witness, at which point she recanted her testimony in full. In rebuttal, she testified that Kourí had induced her to lie, and that the contract between ACHS and Fundación Panamericana was a sham that had been altered and post-dated to make it appear legitimate. Although Ornelas originally implicated Kourí's lead counsel (Benny Frankie Cerezo) in the fabrication, she later testified that neither Cerezo nor co-counsel Charles Daniels was involved in soliciting false testimony. After both Sotomayor and Borel moved unsuccessfully for a mistrial, Ornelas also testified that neither co-defendant had played any part in the scheme to provide false testimony. The court provided both Sotomayor and Borel the opportunity to cross-examine Ornelas,[5] and issued a limiting instruction to the jury.

## DISCUSSION

We address the many issues raised in these appeals as follows: (1) the sufficiency of the evidence on which Borel and Kourí were convicted of violating 18 U.S.C. § 666; (2) evidentiary challenges made by Sotomayor; (3) Kourí's Sixth Amendment claim of attorney conflict-of-interest; (4) the potential prejudicial effect of Ornelas's testimony on Sotomayor and Borel; (5) Kourí and Borel's challenge to the jury instructions; (6) Kourí's sentencing challenge; (7) the admissibility of evidence received by the FBI from the Comptroller

---

[5] Kourí also had the opportunity to cross-examine Ornelas.

-6-

General of Puerto Rico; and (8) the legal capacity of the interim U.S. Attorney for the District of Puerto Rico.

## I.  The Sufficiency of the Evidence as to Kourí and Borel

When a conviction is challenged on sufficiency grounds, we evaluate the evidence "'in the light most agreeable to the prosecution and decide whether that evidence, including all plausible inferences extractable therefrom, enables a rational fact-finder to conclude beyond a reasonable doubt that the defendant committed the charged crime.'"  United States v. Ortiz de Jesús, 230 F.3d 1, 5 (1st Cir. 2000) (quoting United States v. Noah, 130 F.3d 490, 494 (1st Cir. 1997)).

### A.  Kourí

Kourí argues that insufficient evidence was introduced to prove that he was an "agent" of ACHS, one of the elements of an embezzlement conviction under 18 U.S.C. § 666.  Section 666(d)(1) defines the term "agent" as "a person authorized to act on behalf of another person . . . and, in the case of an organization . . . , includ[ing] a servant or employee, and a partner, director, officer, manager, and representative."  Kourí's basic argument is that, because he was merely an HIID-employed consultant providing advisory services to ACHS, and was not on the ACHS payroll, he cannot fall under the statutory definition of "agent."  In other words, he argues that he was not "authorized to act on behalf of ACHS."  He also argues that, as an

outside consultant, he was not an "agent" of ACHS by virtue of being an ACHS employee, partner, director, officer, manager, or representative. See United States v. Ferber, 966 F. Supp. 90, 100 (D. Mass. 1997) (suggesting that a defendant may qualify as a § 666(d)(1) "agent" if he is covered by either aspect of the statutory definition). We need not determine whether Kourí was authorized to act on behalf of ACHS, because we conclude that there was sufficient evidence to show that he was a "director," "manager," or "representative" of ACHS in accordance with the statutory definition.

In Salinas v. United States, 522 U.S. 52, 55-61 (1997), the Supreme Court held that § 666 is extremely broad in scope. The Court noted the "expansive, unqualified language" of the statute, as well as the "broad definition of the 'circumstances' to which the statute applies." Id. at 56-57. Although Salinas only addressed which organizations receiving federal funds are covered by § 666 generally, and not which persons are covered by § 666(d)(1) in particular, we understand the Supreme Court's "expansive" approach to include persons who act as directors, managers, or representatives of covered organizations, even if those persons are not actually employed by the organizations from which they embezzled. As Judge Garza recognized in his dissent in United States v. Phillips, 219 F.3d 404 (5th Cir. 2000), such an expansive definition of "agent" is necessary to fulfill the purpose of § 666, i.e., to protect the integrity of federal funds:

> [T]he expansive statutory definition [in
> § 666(d)(1)] recognizes that an individual can
> affect agency funds despite a lack of power to
> authorize their direct disbursement. Therefore,
> to broadly protect the integrity of federal funds
> given to an agency, § 666 applies to any
> individual who represents the agency in any way,
> as representing or acting on behalf of an agency
> can affect its funds even if the action does not
> directly involve financial disbursement.

Id. at 422 n.3 (Garza, J., dissenting).[6] As the record in this case clearly shows, an outside consultant with significant managerial responsibility may pose as significant a threat to the integrity of federal funds as a manager actually employed by the agency in question. Furthermore, the inclusion of "employee" in the statutory language as a separate qualification suggests that the definition of agent includes "directors," "managers," and "representatives" who are not technically employees.

The only question remaining is whether the evidence showed that Kourí acted as a "director," "manager," or "representative" of ACHS. Corcino testified at length that all ACHS decisions would be approved by Kourí, that Kourí would meet with city officials on behalf

---

[6] The Phillips majority did not disagree with this proposition. 219 F.3d at 411. They premised their decision (not finding an agency relationship) on the indirect connection between the potential "agent" and the government entity from which he was accused of embezzling. Id. at 412-13. In the instant case, Kourí was directly involved with the organization from which he embezzled, albeit not in a formal employer-employee relationship. Our holding, therefore, is consistent with the Phillips majority's conclusion that "there must be some nexus between the criminal conduct and the agency receiving federal assistance." Id. at 413-14.

of ACHS, and that Kourí made employee firing and hiring decisions.  In short, although Kourí was officially a consultant to ACHS, the jury rationally could have found that he acted as its executive director. Kourí's claim that his opinions were merely advisory and could be ignored by ACHS officials is not supported by any evidence.  There was thus sufficient evidence for a rational jury to find beyond a reasonable doubt that Kourí was an "agent" of ACHS for purposes of 18 U.S.C. § 666(d)(1).

### B.  Borel

Borel makes a three-part challenge to the sufficiency of the evidence for his conviction: first, he argues that the evidence shows that he embezzled from Octagon (a corporation that does not receive federal funds) rather than from ACHS; second, he claims that there was insufficient evidence to prove his specific intent to embezzle; and third, he argues that there was insufficient evidence to prove that he was an agent of ACHS at the time of the embezzlement, as required by § 666.

### 1.  Embezzlement from ACHS and Specific Intent

The Government argues that the evidence clearly shows Borel's involvement in the $50,000 embezzlement for which he was convicted. Two $25,000 ACHS checks, drawn in part from federal funds, were deposited into Octagon's account on September 24, 1992.  Corcino testified that these checks were made at the direction of Kourí, were

-10-

not for any legitimate purpose, and had been picked up at Corcino's office by Borel, who had control of the Octagon operating account and check-writing privileges at the time. Several days later, between September 28 and October 1, 1992, seven checks were issued from the Octagon account, in uneven amounts, totaling precisely $50,000.[7] All seven checks were written by Borel. Four of the checks were made payable to Advanced Food Service, an entity controlled by Kourí. Corcino delivered the cash proceeds of these four checks directly to Kourí. The three remaining checks were payable directly to Borel, who told Corcino that he had cashed them and delivered the proceeds to Kourí.

Corcino's testimony and the supporting documentary evidence detail a transaction in which the following occurred: Kourí ordered that ACHS pay $50,000 to Octagon for no legitimate reason. Borel, who was in charge of the Octagon checking account, picked up these checks from Corcino's office, and deposited them in the Octagon account. Borel was thus aware that Octagon had $50,000 of ACHS money in its account. Borel then wrote seven checks for seemingly random amounts, which happened to total exactly $50,000. Four of these checks were made to an organization primarily run by Kourí. Those four checks were cashed, and the cash found its way to Kourí. The other three checks

---

[7] The checks were for $7,142.85, $8,343.85, $3,290.50, $7,598.55, $8,677.30, $6,993.50 and $7,953.45.

-11-

were made payable to Borel.  He cashed those checks and gave the proceeds to Kourí.

From this evidence, particularly the fact that Borel was involved in the transaction prior to the deposit of ACHS funds in the Octagon checking account, a rational jury could conclude beyond a reasonable doubt that Borel participated in an embezzlement from ACHS.[8] Moreover, the evidence details a somewhat complicated scheme in which Borel wrote checks totaling the exact amount of illegitimate funds and delivered significant amounts of cash to Kourí.  Even if Borel was unaware that the payments were destined for a political organization, the jury could have concluded beyond a reasonable doubt that Borel knew that ACHS money was being funneled through Octagon to Kourí for no apparent legitimate reason, and that Borel had the specific intent to collaborate in that embezzlement.

## 2.  Agency

Borel also argues that there was insufficient evidence to prove that he was an "agent" of ACHS for purposes of 18 U.S.C. § 666. As we explained above, § 666 has been given a wide scope, to include all employees "from the lowest clerk to the highest administrator."

---

[8] Borel argues, in part, that he cannot be convicted under § 666 for embezzlement from Octagon, because Octagon is not an entity that received federal funds.  We need not address this argument because we find that the evidence is sufficient to prove that Borel embezzled, or aided and abetted embezzlement, from ACHS (which undisputably is an entity that received federal funds).

United States v. Brann, 990 F.2d 98, 101 (3d Cir. 1993). Borel argues inconsistently as to whether he was an employee of ACHS at the time of the embezzlement for which he was charged (September 24 -October 1, 1992). At times, he admits that he was a "mere employee" of ACHS, which would make him an agent pursuant to the statutory definition. 18 U.S.C. § 666(d)(1). Alternatively, he argues that the contract between ACHS and Octagon transferred his services so that he became an employee of Octagon and not an employee of ACHS. Corcino testified – and Borel does not challenge – that under the ACHS-Octagon contract, ACHS employees (such as Borel) would be available to Octagon but would remain employed and paid by ACHS for six months after the contract was executed. After those six months had passed, the employees would become Octagon employees, and be paid by Octagon. The record indicates that Octagon was incorporated on April 30, 1992, and that the contract with ACHS was executed on June 1, 1992. Using either date, the embezzlement occurred before the six-month window ended, while Borel was still employed by ACHS. The jury therefore had sufficient evidence to conclude beyond a reasonable doubt that Borel was an employee, and therefore a § 666(d)(1) agent, of ACHS at the time of the embezzlement.

## II.  Evidentiary Challenges

Sotomayor makes three claims that certain evidence should not have been admitted. We review the district court's evidentiary rulings for abuse of discretion. United States v. Mojica-Báez, 229 F.3d 292,

-13-

300 (1st Cir. 2000).  Erroneous rulings not of a constitutional magnitude are harmless if it is highly probable that the error did not contribute to the verdict.  United States v. Tse, 135 F.3d 200, 209-10 (1st Cir. 1998).

### A.   The Testimony of the FBI Agent

During direct examination, Sotomayor's counsel asked Sotomayor why she had referred to the federal agents in a negative manner during prior testimony.  Sotomayor responded that "[her] house was visited [by agents] several times," and that an FBI agent had taken her mother "out of bed by striking her."  The prosecution immediately objected, noting that no evidence of police brutality had been introduced, claiming that no such brutality had occurred, and suggesting that Sotomayor was attempting to prejudice the jury in her favor.  In response, the court indicated that it would allow the prosecution to call the federal agents as witnesses in order to clarify for the jury whether any police brutality had occurred.

Sotomayor claims that the court's persistence in ensuring that her testimony would be rebutted by federal agents amounted to the court calling a witness to impeach her; she argues that this action was so prejudicial that it warrants reversal of her conviction.[9]  Even if

---

[9]  Sotomayor focuses on the court's use of the word "insist" in its statement that "[it is] insisting, for the sake of clearing the matter, that you bring the agents involved in your rebuttal."  In the context of the colloquy, however, it is clear that the court was only insisting that some response be made to Sotomayor's provocative and unsupported

-14-

the district court erred in soliciting the testimony of the FBI agent, any such error was harmless. This was one short incident in a fifty-eight day jury trial. Cf. United States v. Filani, 74 F.3d 378, 386 (2d Cir. 1996) ("[I]n reviewing the trial transcript we must take care not to focus on isolated episodes, but to assess the trial court's inquiries in light of the record as a whole."). Furthermore, the agent's testimony was on a minor matter collateral to the issue of Sotomayor's guilt. Lastly, Sotomayor's testimony had already been impeached at length by extensive evidence that she had committed the crimes for which she was charged, including the crime of witness tampering. It is highly probable that any error here did not contribute to the verdict. Tse, 135 F.3d at 209-10.

### B. Recorded Conversations

At trial, Sotomayor objected to the introduction of three conversations recorded with the consent of Sotomayor's housekeeper, Josefa Navarro.[10] The district court ruled that the recorded

_____

statements, and that it was only the defense's refusal to enter an appropriate stipulation that mandated the calling of a rebuttal witness.

[10] These included a telephone conversation between Navarro and co-conspirator Milagros García León (who pled guilty to witness tampering), a telephone conversation between Navarro and Sotomayor, and a face-to-face conversation among Navarro, García, and Sotomayor.

conversations were admissible in full as statements against penal interest by an unavailable witness, Fed. R. Evid. 804(b)(3), and party admissions, Fed. R. Evid. 801(d)(2)(A). On appeal, Sotomayor challenges only the admission of García's statements as a violation of the Confrontation Clause of the Sixth Amendment. Bruton v. United States, 391 U.S. 123 (1968). This Court has held that a Bruton error occurs "where the codefendant's statement 'expressly implicates' the defendant, leaving no doubt that [the statement] would prove 'powerfully incriminating.'" United States v. Smith, 46 F.3d 1223, 1228 (1st Cir. 1995) (quoting Bruton, 391 U.S. at 124 n.1) (internal quotations omitted). No Bruton error occurs when the statements are only incriminating because they have been "'linked with evidence introduced at trial.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 208 (1987)). In other words, the Confrontation Clause permits "out of court statements [which] neither name nor impugn [the defendant] directly, and thus cannot be supposed to have implanted in the jurors' minds the kinds of powerfully incriminating impressions against which Bruton protects." United States v. Limberopolous, 26 F.3d 245, 253 (1st Cir. 1994). We have scrutinized the passages deemed prejudicial by Sotomayor and found that García's statements about guiding Navarro's future testimony concerned only a list of work duties Navarro claimed to have performed for ACHS. Sotomayor's objection is a tortuous one: such a list of duties, being an imperfect description, put pressure on

-16-

her to testify. This falls far short of indicating how the statements either "expressly implicated" her or were "powerfully incriminating." Our careful review of the record provides no additional support for her claim. The district court therefore did not abuse its discretion in admitting the recorded conversations.

### C. Testimony of Fernández and Granados Navedo

On direct examination, Sotomayor testified that she had never been "involved with [Corcino or Kourí] in a scheme to divert [ACHS] checks for personal or political favors." The district court allowed the Government to impeach this testimony by introducing evidence that, on a prior occasion in 1988, Sotomayor had directed Antonio Fernández to purchase an expensive video camera for use in Granados Navedo's campaign,[11] and that in order for Fernández to be repaid, he had been asked to endorse a check in excess of what he was owed. The court then issued a limiting instruction that the evidence could only be used for impeachment purposes.[12] Sotomayor suggests that the evidence in question did not aim to impeach her direct testimony but her cross, and that the district court erred in not excluding it as inadmissible extrinsic evidence of a prior bad act. Fed. R. Evid. 404(b). Because

---

[11] At the time of the incident, Fernández was an advertising contractor for ACHS. Granados Navedo was a candidate for Mayor of San Juan.

[12] The Government had also sought admission pursuant to Fed. R. Evid. 404(b), as probative of intent and absence of mistake. The court denied this request.

-17-

we see no abuse of discretion in the court's finding that Sotomayor opened the door during her direct testimony, we need not address the Rule 404(b) alternative, which was not relied on by the district court.

When a defendant has, on direct examination, made a general denial of engaging in conduct material to the case, the prosecution may impeach that testimony by proving that the defendant did engage in that conduct on a prior occasion. United States v. Cudlitz, 72 F.3d 992, 996 (1st Cir. 1996) (citing United States v. Havens, 446 U.S. 620, 627 (1980); United States v. Pérez-Pérez, 72 F.3d 224, 227 (1st Cir. 1995)). Here, on direct examination, Sotomayor denied using ACHS funds to make political contributions. The testimony of Fernández and Granados Navedo acted to impeach that denial. The district court, therefore, did not abuse its discretion by admitting that evidence.

## III. Kourí's Sixth Amendment Claim

Appellant Kourí premises a Sixth Amendment ineffective assistance of counsel claim on the bizarre circumstances associated with Ornelas's recantation of her defense testimony and subsequent testimony for the prosecution. Specifically, he argues that various conflicts of interest faced by Attorney Daniels during the cross-examination of Ornelas deprived him of his right to effective counsel. Cuyler v. Sullivan, 446 U.S. 335, 348 (1980) (conflict of interest may deprive defendant of effective representation). He also suggests that the district court inadequately inquired into the potential conflicts,

-18-

thus triggering automatic reversal. <u>United States</u> v. <u>Levy</u>, 25 F.3d 146, 154 (2d Cir. 1994). Although claims of ineffective assistance must generally be reserved for collateral proceedings under 18 U.S.C. § 2255, we find the record here "sufficiently developed to allow reasoned consideration" of this claim on direct appeal. <u>United States</u> v. <u>Natanel</u>, 938 F.2d 302, 309 (1st Cir. 1991). We present the factual background for this claim at some length below.

### A. The Facts

On May 3, 1999, Ornelas testified by video-conference from Mexico City as a defense witness. Her testimony sought to establish that the payments made to Fundación Panamericana, of which she was the director, were legitimate payments for services rendered to ACHS. Daniels was scheduled to examine Ornelas on May 4, 1999. When Daniels met with Ornelas early that morning to discuss her testimony, she indicated that her testimony of the previous day was perjurious, and that certain documentation supporting that testimony had been back-dated or fabricated. She did not apparently suggest at that time that either Kourí or Attorney Cerezo were involved in the fraud, however. As a result, Cerezo and Daniels informed the district court that Ornelas had elected to end her testimony. Daniels told the court that "serious ethical considerations" prevented Ornelas from testifying further; Cerezo noted that there was a "small discrepancy" in the facts, and also told the court that Ornelas had ceased her testimony

-19-

because her lawyers refused to recognize the authority of the U.S. Attorney in Mexico. The court accepted counsel's explanations, informed the jury that Ornelas would not be able to testify further at that time, and reserved its decision as to the appropriate remedy (e.g., striking Ornelas's previous testimony) for another day.

On May 29, 1999, Ornelas met with representatives of the U.S. Attorney's Office in Miami, Florida. She informed the United States that her May 3 video-conference testimony had been false. Ornelas then said that Kourí had encouraged her to testify falsely by telling her that she would go to jail if she told the truth (and exposed his money-laundering scheme). Ornelas also implicated Cerezo in the scheme to provide false testimony. The United States subsequently filed an ex parte informative motion alerting the district court to Ornelas's perjury and proposed recantation, and suggesting that the court might need a waiver from Kourí to allow Cerezo's continued representation of him. The ex parte motion did not implicate Daniels in any respect.

On June 7, 1999, before Ornelas testified for the prosecution, the district court met with counsel to determine the appropriate course of action to avoid a mistrial. The court concluded that there was no per se Sixth Amendment violation requiring Cerezo's automatic withdrawal, because the allegation of witness tampering did

not implicate Cerezo in the conduct for which Kourí was charged.[13]

However, the court determined that Cerezo would not be able to continue

his representation of Kourí unless Kourí provided a waiver, and decided

to hold a hearing on this issue.[14] At the hearing, the district court

explained Cerezo's potential conflict of interest to Kourí, and asked

Kourí if he wanted Cerezo to continue to represent him.  Kourí answered

in the affirmative.[15] Kourí also said that he wished to have Daniels

continue to represent him.  The court further explained that Daniels

would conduct the cross-examination of Ornelas, and Kourí assented to

this approach.[16]

The Government then commenced its voir dire examination of

Ornelas, at which she recanted her earlier testimony and detailed

Kourí's involvement in the fabrication of that testimony.  The

---

[13] See United States v. Marcano-García, 622 F.2d 12, 17 (1st Cir. 1980)
(withdrawal required when counsel implicated in the crime for which his
client is on trial).

[14] The court indicated that the hearing would resemble a Rule 44(c)
hearing, which is mandatory when counsel represents more than one
defendant.  Fed. R. Crim. P. 44(c).  Here, of course, Cerezo and
Daniels represented only Kourí, and thus Rule 44(c) was not applicable.

[15] The Court: "So, for the time being, you are waiving any conflict of
interest between you and Mr. Cerezo."

The Defendant: "Yes."

[16] The Court: "You don't have any problem with Mr. Daniels being in
charge of the examination, at least this afternoon . . . ."

The Defendant: "Not at all. . . .  I have no problem with that."

Government also introduced documents providing evidence of the fabrication and supporting Ornelas's revised testimony.

Prior to cross-examination, the Government proffered that Ornelas would testify that Cerezo had suborned perjury. Cerezo denied this charge. The district court then allowed the Government to conduct a direct examination of Ornelas, in chambers, solely with respect to the involvement of Cerezo and Daniels in the fabrication of testimony. At that point, Ornelas testified that Cerezo and Daniels were unaware of Kourí's scheme to fabricate testimony, and that Kourí had expressed dismay that his lawyers might find out about the scheme. She indicated that all of Kourí's explicit instructions to her on how to testify had occurred at private meetings between her and Kourí without either Cerezo or Daniels being present. Ornelas also testified that, to the extent she had told the U.S. Attorney that Cerezo was involved, she had mistakenly named Cerezo instead of Kourí.

Ornelas then repeated her recantation before the jury, after which Daniels cross-examined her in open court. On cross, Ornelas reviewed some of her prior testimony as to particular events. She also testified on cross-examination that Kourí had never asked her to cover up his fraudulent acts at the time that they occurred, but had only sought her help in back-dating documents at the time of trial.

Finally, Daniels asked Ornelas if any of Kourí's attorneys had been involved in the fabrication of evidence; she again answered no.[17]

**B.  Analysis**

Kourí does not contend that the potential conflict of interest with Cerezo caused a Sixth Amendment violation.  However, he does suggest that Daniels's cross-examination of Ornelas was so plagued by conflicts of interest as to constitute ineffective assistance of counsel.  Kourí points to three specific conflicts: first, that Daniels had an incentive to avoid implicating himself in the perjury; second, that Daniels was a material witness to the perjury; and third, that although not conflicted himself, Daniels relied on the counsel of conflict-ridden Cerezo.  We may immediately discount the third claim of conflict: Kourí had waived any Sixth Amendment conflict of interest claim with respect to Cerezo.  This waiver cannot be erased by a claim against Daniels which is premised on Cerezo's conflicts.  Moreover, Kourí has adduced no evidence that Daniels relied on Cerezo in cross-examining Ornelas, nor that Daniels was unprepared to conduct that cross-examination.  The instant case is thus significantly different from that relied upon by Kourí, United States v. Tatum, 943 F.2d 370, 375-78 (4th Cir. 1991), in which a new trial was required when there

[17] Daniels had expressed the worry that the jury would conclude that he and Cerezo had cooperated in Kourí's scheme to defraud the court, and that their representation of Kourí would be irreparably harmed by that conclusion.  The court suggested that he ask Ornelas this question in order to clarify counsel's non-involvement during cross-examination.

was an actual, un-waived conflict of interest on the part of lead counsel, and co-counsel had heavily relied on lead counsel during the trial.

Kourí raised no objection at trial to Daniels's cross-examination of Ornelas; in fact, he endorsed such representation at the hearing where he waived his conflict with Cerezo.[18]  Where a defendant, having knowledge of the circumstances giving rise to an arguable conflict on his lawyer's part, fails to object to the lawyer's continued representation despite having been afforded the opportunity to do so, he must demonstrate that an actual conflict of interest adversely affected his lawyer's performance in order to establish a per se Sixth Amendment violation.  United States v. Soldevila-López, 17 F.3d 480, 486 (1st Cir. 1994); United States v. Rodríguez Rodríguez, 929 F.2d 747, 749 (1st Cir. 1991).  To show an actual conflict of interest, the defendant must show that "the lawyer could have pursued a plausible alternative defense strategy or tactic" and that "the alternative strategy or tactic was inherently in conflict with or not undertaken due to the attorney's other interests or loyalties." Soldevila-López, 17 F.3d at 486 (citing Guaraldi v. Cunningham, 819 F.2d 15, 17 (1st Cir. 1987)).  Kourí's claim that Daniels should have cross-examined Ornelas at greater length and in greater detail

_____

[18] Because we find that there was no actual conflict of interest here, we need not determine whether Kourí's assent to Daniels's cross-examination of Ornelas was a sufficient waiver.

-24-

does not meet this standard for several reasons.  First, there is no evidence of Daniels's conflict.  Kourí, Ornelas, and the U.S. Attorney had repeatedly maintained that Daniels was not involved in the subornation of perjury.  Kourí does not even now suggest that Daniels suborned perjury, only that Daniels feared being implicated in the fabrication.  Given the overwhelming evidence that Daniels was not involved in the plot to fabricate evidence and suborn perjury, we see no reason for him to have altered his cross-examination to avoid being implicated.  Second, even if Daniels did harbor some fear that Ornelas would implicate him in the fabrication, it is not likely that a cross-examination designed to discredit Ornelas's rebuttal testimony would have caused her to implicate him in the matter.  Simply put, Kourí has not adequately explained how the alleged conflict might have affected Daniels's course of action.  Third, although a more aggressive cross-examination of Ornelas may have been a "plausible" strategy, it was probably not superior to Daniels's approach: in fact, such a low-key cross-examination served Kourí's interests in minimizing the prejudicial effect of the perjury and witness tampering (however difficult to accomplish).  Given the number of documents introduced supporting Ornelas's rebuttal testimony, it would have been foolhardy for Daniels to have pursued the strategy Kourí now suggests; i.e., to have attempted to discredit the rebuttal.  <u>Cf.</u> <u>United States</u> v.

Buculavas, 98 F.3d 652, 656-67 (1st Cir. 1996) (proposed alternative strategy would have resulted in "cross-examinational meat grinder").

As for the possibility that Daniels might have been called as a material witness to Ornelas's perjury, this is little more than speculation on Kourí's part.  See Soldevila-López, 17 F.3d at 487 ("theoretical or merely speculative conflict" insufficient for Sixth Amendment violation) (internal quotations omitted).  Not only was Daniels never called as a witness, but the Government never suggested that he would be called.  Moreover, Kourí has not alleged how any theoretical possibility that Daniels might be called as a witness affected his behavior as counsel.  Cf. United States v. Kliti, 156 F.3d 150, 155 (2d Cir. 1998) (hearing necessary only when a defendant would forgo important testimony by his attorney because of continued representation by that attorney).  Kourí has not suggested that he needed Daniels to testify on his behalf, nor that Daniels's continued representation prevented any such testimony.

Finally, we cannot agree that the district court failed to conduct an appropriate inquiry as to Daniels's potential conflicts. Kourí suggests that he was entitled to a Foster hearing, at which the court would have explained any potential conflicts and sought an explicit waiver from the defendant.  See United States v. Foster, 469 F.2d 1, 4 (1st Cir. 1972).  However, this Court has said that the circumstances in which a Foster hearing is required are "narrow"; i.e.,

-26-

only in "criminal prosecutions where one attorney speaks for two or more defendants." Buculavas, 98 F.3d at 655-56. Such was not the case here. Cerezo and Daniels represented only Kourí. Moreover, as we detailed above, the district court undertook a sufficiently extensive inquiry into the circumstances of the fabrication, after which it was satisfied that Daniels was not implicated in the subornation of perjury, and thus had no conflict with Kourí. See id. at 657 (relevance of determination by trial judge that no conflict existed); see also Brien v. United States, 695 F.2d 10, 15 n.10 (1st Cir. 1982) (automatic reversal only required when actual conflict discovered, even if trial court fails to conduct full inquiry).

## IV. Spillover Prejudice

Appellants Borel and Sotomayor were not aware that Ornelas would recant her testimony until the Government called her as a rebuttal witness. At that point, they were made aware of the Government's ex parte motion, which detailed Ornelas's proposed testimony. They did not object, move for a severance, or move for a mistrial at that time. However, after Ornelas testified, Borel and Sotomayor moved for a mid-trial severance or, in the alternative, for a mistrial. The district court refused to grant either motion, but did give the jury a limiting instruction indicating that it should not hold Kourí's shenanigans against the other two defendants. The court also allowed counsel to elicit from Ornelas that neither Borel nor Sotomayor

-27-

was involved in, or even aware of, the plot to fabricate testimony. Nonetheless, Borel and Sotomayor now argue that the prejudice resulting from the fabrication and recantation was so severe as to make the court's refusal to grant a mistrial or to sever proceedings in mid-trial an abuse of discretion.

## A. Severance

There is a strong preference in the federal system for jointly trying defendants involved in related crimes. Zafiro v. United States, 506 U.S. 534, 537 (1993). Separate trials are not warranted unless "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539. The trial court is afforded "considerable leeway" in determining whether severance is appropriate, and we will overturn that determination "only if that wide discretion is plainly abused." United States v. Pierro, 32 F.3d 611, 616 (1st Cir. 1994) (internal quotations omitted). A mid-trial severance is therefore an "extraordinary measure, warranted in very few cases." United States v. Fisher, 106 F.3d 622, 632 (5th Cir. 1997).

Borel and Sotomayor suggest that the revelation of Kourí's extensive plot to fabricate testimony "spilled over" so that the jury viewed them in a negative light. For a claim of spillover prejudice to prevail, "a defendant must prove prejudice so pervasive that a

miscarriage of justice looms." Pierro, 32 F.3d at 615 (citing United States v. Sabatino, 943 F.2d 94, 96-97 (1st Cir. 1991)). That quantum of prejudice did not exist here. Neither Borel nor Sotomayor were implicated in the scheme to fabricate testimony; in fact, testimony was elicited to show that they had no knowledge of the scheme. See id. ("[N]othing implicated appellant in the peccadilloes."). At any rate, the trial court provided limiting instructions to account for the unusual situation; instructions that we must presume were heeded by the jury. Id. at 616. Moreover, the fact that Kourí was impeached by Ornelas's testimony is not prejudicial toward the other defendants. United States v. La Torre, 639 F.2d 245, 249 (5th Cir. Unit A Mar. 1981) (impeachment of co-defendant with prior perjury conviction); United States v. Shorter, 54 F.3d 1248, 1259 (7th Cir. 1995). The fact that the jury was more likely to find Kourí guilty after learning of his actions is also not prejudicial with respect to the other appellants. Cf. United States v. Martin, 964 F.2d 714, 717 (7th Cir. 1992) (co-defendant's entrance of guilty plea during trial). In fact, the only example cited by appellants in which the potential for spillover prejudice required mid-trial severance occurred where the prejudice resulted from evidence later ruled inadmissible. Fisher, 106 F.3d at 631-32. Such is not the case here. All of Ornelas's testimony was admissible.

The fact that Kourí's scheme was disruptive is also insufficient to mandate severance, absent the demonstration of "special prejudice of a kind or to a degree not susceptible to remediation by prompt curative instructions." Pierro, 32 F.3d at 616; see also United States v. Rocha, 916 F.2d 219, 230 (5th Cir. 1991) (jury instruction sufficient to remedy disturbance caused by co-defendant); United States v. Tashjian, 660 F.2d 829, 838 (1st Cir. 1981) (same). Because the district court retained firm control of the trial, the disruptive effect of the recantation was limited and not prejudicial.

Finally, appellants argue that they were unfairly prejudiced because they had premised their defenses on Ornelas's original promised testimony, and they had no way of knowing that the proposed testimony was a fabrication. As for Borel, this argument is without merit, as Ornelas's testimony was essentially unrelated to the crime for which he was charged, or to his conviction. Although Sotomayor was more extensively implicated by Ornelas's revised testimony, she also was in a position to know that the proposed testimony was perjurious. She was not bound to offer a defense consistent with Kourí's; this Court has allowed co-defendants to offer inconsistent defenses without requiring severance. United States v. Drougas, 748 F.2d 8, 19 (1st Cir. 1984). Moreover, she had ample opportunity to cross-examine Ornelas in order to re-establish her defense. And lastly, Sotomayor has not suggested

-30-

how she would have conducted her defense differently were it not for Ornelas's testimony and recantation.

### B.  Mistrial

For much the same reasons, the district court's refusal to grant a mistrial was not an abuse of discretion.  First, limiting instructions are ordinarily an appropriate method of preempting a mistrial.  United States v. Sepúlveda, 15 F.3d 1161, 1184-85 (1st Cir. 1993).  Appellants did not object to the court's choice of jury instructions, and they have not challenged it here.  Second, "swiftness in judicial response is an important element in alleviating prejudice once the jury has been exposed to improper testimony."  Id.  Here, the district court immediately suggested that Ornelas be asked a question allowing her to testify that neither Sotomayor nor Borel were involved in the plan to fabricate testimony.  The court then offered a limiting instruction.  There was no time for "sores to fester."  Id. at 1185.  Finally, we must presume that jurors are able and willing to heed limiting instructions.  Id.  Appellants have cited no reason why the jury  would be unable to do so here.

One final note.  We cannot ignore appellants' delay in bringing their motion for such extraordinary remedies.  Although they became aware of the contents of the ex parte motion prior to Ornelas's testimony, and thus could anticipate what that testimony would entail, they waited to object until after Ornelas had testified.  Whatever

appellants' reason for waiting to object, we cannot be overly generous in remediation. <u>Tashjian</u>, 660 F.2d at 838. Appellants should have sought severance at the earliest opportunity, not after the fireworks had been set off.

## V.  Jury Instructions

The statutory definition of "agent" in 18 U.S.C. § 666 defines the term as "a person authorized to act on behalf of another person . . . , and, in the case of an organization . . . , includ[ing] a servant . . . [,] employee, . . . , partner, director, officer, manager, and representative."

The district court, having concluded that it was appropriate to expand slightly on the definition of agency provided in § 666, gave the following instruction:

> The term "agent" is defined in the statute as a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative. The term "agent" means any employee, officer or director of Advanced Community Health Services and/or the San Juan AIDS Institute. The term "agent" also includes a person authorized by another to act for or in place of him, or one entrusted with another's business. The term "agent" also includes one who the principal, either intentionally or by want of ordinary care, induces third persons to believe to be his agent, though he has not, either expressly or by implication, conferred authority on him. A person who, whether or not authorized, reasonably appears to third persons, because of

> manifestations of another, to be authorized to
> act as agent for such other, is also an agent.

Basically, the district court instructed the jury that a person with "apparent authority" could be an agent for purposes of § 666. Both Borel and Kourí argue that the statutory definition of "agent" excludes persons with only apparent authority, and that the jury instruction was therefore erroneous.

Because neither defendant objected to the instruction in accordance with Federal Rule of Criminal Procedure 30,[19] we review for plain error. United States v. Randazzo, 80 F.3d 623, 631 (1st Cir. 1996). For an instruction to be in plain error, it must have "affected substantial rights," id. at 632, meaning that it must probably have affected the outcome of the trial, United States v. Romano, 137 F.3d 677, 682 (1st Cir. 1998). Moreover, it must be an error of the type that causes a "miscarriage of justice, . . . seriously affect[s] the integrity [of the trial,] or impair[s] 'public confidence' in the proceedings." Randazzo, 80 F.3d at 632 (quoting United States v. Olano, 507 U.S. 725, 736-37 (1993)).

We cannot say that there was plain error here. Even if the district court's conclusion as to the scope of 18 U.S.C. § 666(d)(1) was incorrect, sufficient evidence was introduced to convict both Borel

---

[19] "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Fed. R. Crim. P. 30.

and Kourí without any reliance on the "apparent authority" segment of the jury instruction. As we explained above, Borel was an employee of ACHS, and was thus clearly included in the statutory definition of "agent" provided by the district court. Although Kourí was technically a consultant of ACHS without a formal position, the evidence indicated that ACHS employees reported directly to him and that he had the responsibilities and authority of manager, director, or representative of ACHS. Cf. United States v. Phillips, 219 F.3d at 423 n.3 (Garza, J., dissenting) ("the expansive statutory definition of 'agent' . . . recognizes that an individual can affect agency funds despite a lack of power to authorize their direct disbursement"); see also Salinas, 522 U.S. at 57-60 (scope of § 666 to be construed broadly); United States v. Neder, 527 U.S. 1, 18 (1999) (affirming convictions in spite of instructional error where the evidence made it clear beyond a reasonable doubt that a rational jury would have found defendants guilty even if properly instructed). In all likelihood, the jury would have convicted Kourí even without the expanded instruction. Thus even if the instruction was erroneous, it did not affect either appellant's substantial rights, and was not plain error.

## VI.  Sentencing

Kourí challenges the two-level enhancement to his sentence for an abuse of a position of trust. U.S.S.G. § 3B1.3. His primary argument is that he could not have abused a position of trust because,

as an outside consultant to ACHS, he lacked actual decision-making power and other individuals with discretionary power could have ignored his counsel. In determining the appropriateness of a sentence enhancement, we determine the legal meaning of the Guideline de novo, but review the district court's application of the Guideline to the facts at hand for clear error. United States v. Tardiff, 969 F.2d 1283, 1289 (1st Cir. 1992). This Court has already determined that a defendant need not legally occupy a formal "position of trust," nor have "legal control" of an organization, for the enhancement to apply. United States v. Newman, 49 F.3d 1, 8-9 (1st Cir. 1995). De facto control, which allows the defendant to exercise the type of discretion contemplated by the enhancement, suffices. Id. The district court found that Kourí was for all purposes the "heart and soul" of ACHS, i.e., that he controlled ACHS finances. The court also noted Kourí's role in making decisions for corporations that had direct business relationships with ACHS. In short, the district court found that Kourí enjoyed the "professional or managerial discretion" contemplated by the Guideline. U.S.S.G. § 3B1.3 cmt. n.1. As the record amply supports this conclusion, we can find no clear error here.

**VII.  Evidence Received from the Office of the Comptroller**

Appellants sought suppression of all evidence obtained by the United States from the Office of the Comptroller General of Puerto

Rico, based on the fact that the Comptroller had released that evidence to the FBI in contravention of Puerto Rico law. The district court considered the constitutional and statutory framework governing the Office of the Comptroller, and concluded that these laws and regulations did not prohibit such a referral. United States v. Kourí-Pérez, No. 97-091 (JAF) (D.P.R. Apr. 22, 1998) (memorandum order). We need not determine whether the disclosure by the Office of the Comptroller violated Puerto Rico law, for "it is well settled that in federal prosecutions evidence admissible under federal law cannot be excluded because it would be inadmissible under state law." United States v. Santana, 895 F.2d 850, 853 (1st Cir. 1990) (quoting United States v. Quiñones, 758 F.2d 40, 43 (1st Cir. 1985)) (internal quotation marks omitted). Appellants have suggested no federal law or federal constitutional right that was violated here.

## VIII. The Interim United States Attorney

Appellants claim that the unusual tenure of interim U.S. Attorney Guillermo Gil, who has acted in an interim capacity for over seven years, violates the Appointments Clause and constitutional principles of separation of powers, and is unconstitutional as applied to these appellants. This Court, however, has already held that "the interim United States attorney [for the District of Puerto Rico] holds his office lawfully." United States v. Hilario, 218 F.3d 19, 21 (1st Cir.), cert. denied, 121 S. Ct. 572 (2000).

## CONCLUSION

For the reasons herein, the convictions and sentences of Yamil Kourí-Pérez, Jeannette Sotomayor-Vázquez and Armando Borel-Barreiro are upheld, and the challenged judgments of the district court are **affirmed**.