Jaques v. Londonderry, et al.      CV-00-432-M   06/17/02
UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Michael E. Jaques
and Michael W. Jaques,
      Plaintiffs

      v.                              Civil No. 00-432-M
                                      Opinion No. 2002 DNH 117
Town of Londonderry, Chief
Joseph Ryan, Sgt. Gerard
Dussault, Officer Chris
Gandia, and Officer Jack
Slade,
      Defendants


**O R D E R**


     Michael E. Jaques ("Michael") and his father, Michael W.

Jaques ("Mr. Jaques"), have sued the Town of Londonderry ("the

Town") and several members of the Londonderry Police Department

("LPD"), in both their individual and official capacities, for

injuries resulting from an incident in which Michael discharged a

handgun in the direction of three LPD officers and was

subsequently shot by Sgt. Gerard Dussault.  Plaintiffs' nine-

count complaint asserts four federal claims under 42 U.S.C. §

1983, as well as three state claims.[1]  Before the court is

_____

     [1] The remaining two counts are requests for punitive and
enhanced compensatory damages.

defendants' motion for summary judgment.  Plaintiffs object.  For the reasons given below, defendants' motion for summary judgment is granted.

## Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  "To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trialworthy issue as to any material fact."  Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001) (citing Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000)).

> Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be "material" and the dispute over it must be "genuine."  In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.  By like token, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.

2

<u>Navarro v. Pfizer Corp.</u>, 261 F.3d 90, 93-94 (1st Cir. 2001)

(quoting <u>McCarthy v. Northwest Airlines, Inc.</u>, 56 F.3d 313, 315

(1st Cir. 1995)).

In defending against a motion for summary judgment, "[t]he non-movant may not rely on allegations in its pleadings, but must set forth specific facts indicating a genuine issue for trial." <u>Geffon v. Micrion Corp.</u>, 249 F.3d 29, 34 (1st Cir. 2001) (citing <u>Lucia v. Prospect St. High Income Portfolio, Inc.</u>, 36 F.3d 170, 174 (1st Cir. 1994)). When ruling upon a party's motion for summary judgment, the court must "scrutinize the summary judgment record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" <u>Navarro</u>, 261 F.3d at 94 (quoting <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990)).

## Factual and Procedural Background

In the early morning hours of September 16, 1997, Mr. Jaques called 911 from his home at 17 Windsor Boulevard after finding his son, Michael, sitting in a bloody bathtub and holding a gun. Sgt. Dussault and Officer Jack Slade of the Londonderry Police

Department responded to the call, arriving at 17 Windsor at approximately 4:20 a.m. Officer Slade went up to the front door and knocked on it. Shortly thereafter, Mr. Jaques came down the stairs, answered the door, and told Officer Slade that Michael: (1) had been drinking all day; (2) had cut his wrists; (3) was armed with a gun; and (4) had been an Army Ranger. As he was led away from the house to a safer position, Mr. Jaques told Sgt. Dussault that there were several rifles in the house. Based upon the information he received from Mr. Jaques, Sgt. Dussault contacted the LPD dispatcher and asked that Officers Chris Gandia and Donald LaDuke be sent to join him and Officer Slade. When Officers Gandia and LaDuke arrived, Sgt. Dussault deployed them to various positions around the house. Sgt. Dussault also asked the dispatcher to send an emergency response team and a negotiator.

With Officers Slade, Gandia, and LaDuke in position, Sgt. Dussault moved his cruiser from the driveway at 17 Windsor to a spot approximately 100 yards away, near the intersection of Windsor Boulevard and Bretton Drive. The other three LPD officers remained in their positions around the house. While at

4

the intersection of Windsor and Bretton, Sgt. Dussault was told by Officer Slade, over a portable radio, that Michael had emerged from the house. Upon learning that Michael was out in the front yard of 17 Windsor, Sgt. Dussault first sent Mr. Jaques down Bretton, where an ambulance had been staged, and then walked back up Windsor toward the house, carrying a .12-gauge shotgun. When Sgt. Dussault got to within about thirty-five yards of the house, he saw Michael in the front yard. He identified himself as a police officer and asked Michael to lie down on the grass.

Michael did not comply. Instead, he began walking toward Sgt. Dussault. Sgt. Dussault did not initially see a firearm in Michael's hand, but believed that Michael was armed, based upon both Mr. Jaques's statement that his son had a gun and Officer Slade's radio report that Michael had something in his hand when he came out of the house. With Michael walking toward him, Sgt. Dussault backed down Windsor, toward the cruiser at the intersection of Windsor and Bretton. As he began backing toward the cruiser, Sgt. Dussault told the other officers, by radio, that he and Michael were moving down Windsor, and he directed the three officers to move toward him.

5

Sgt. Dussault continued backing down Windsor until he reached the cruiser, which he had left with its blue lights flashing. While Sgt. Dussault and Michael were moving down Windsor, Sgt. Dussault repeatedly directed Michael to stop, and to lie down on the pavement. Michael disregarded all of Sgt. Dussault's commands. As Sgt. Dussault was being backed down Windsor, the other three officers were taking a parallel course, through the lawns and woods along the side of Windsor to Sgt. Dussault's left and Michael's right. When Sgt. Dussault reached the cruiser, he switched off the flashing blue light and trained a spotlight on Michael. The spotlight fully illuminated Michael, and allowed Sgt. Dussault to see a pistol in his left hand.

As Michael stood in the spotlight, approximately twenty to twenty-five feet from the cruiser, the three officers took up positions to his right, in the trees near the edge of the street. Again, Sgt. Dussault told Michael to lie down on the street, and to drop his gun. Michael responded by telling Sgt. Dussault that he would not give up the gun, that it would have to be pried from his fingers. At one point, Michael told Sgt. Dussault to shoot him. He then made a slow turn, and stood with his back toward

6

Sgt. Dussault. Michael turned to the right, raised his left arm, and fired his pistol in the direction of Officers Slade, Gandia, and LaDuke. Officer Gandia returned fire with a shotgun, then Sgt. Dussault fired his shotgun, and, finally, Officer Slade returned fire with his handgun. Of the three shots, only Sgt. Dussault's hit Michael.

The preceding facts are undisputed. In their objection to defendants' motion for summary judgment, plaintiffs purport to identify several genuine issues of material fact that preclude summary judgment. While it is not clear that the issues plaintiffs identify are material, or are even disputed, for the purpose of deciding the motion before it, the court resolves all of the following fact questions in plaintiffs' favor.

Michael walked down Windsor at a deliberate pace, and his demeanor was generally calm rather than agitated.[2] As Officers Slade, Gandia, and LaDuke moved from their positions around the house at 17 Windsor to their positions in the woods near the intersection of Windsor and Bretton, they did so silently, and

---

[2] This is plaintiffs' characterization of Michael, and defendants do not appear to dispute it.

7

Sgt. Dussault heard neither their movements nor their radios.[3] At the time of the shooting, Sgt. Dussault was unable to see any of the three officers, due to the darkness and their positions in the woods along the side of the road. As for the locations of the officers, Sgt. Dussault knew that all three were in the woods to his left (Michael's right). He knew Officer Gandia's location to within ten yards, but was less certain of the exact positions of the other two officers.[4] He also knew that one of the three, Officer Slade, was equipped with a body shield.[5] Michael did not know that there were any officers in the woods to his right, did

---

[3] This is a disputed issue of fact. At Michael's criminal trial, Sgt. Dussault testified that he heard all three officers moving into place (App. to Pls.' Mem. of Law, Ex. 2 at 67) and also heard their radios (id. at 71), while Mr. Jaques testified that the officers made no noise of any kind as they assumed their positions in the trees (id. at 390-91).

[4] While plaintiffs make much of Sgt. Dussault's inability to locate the three officers any more precisely, that issue does not appear to be a disputed factual issue. Nowhere do defendants claim that Sgt. Dussault had any better knowledge than that ascribed to him by plaintiffs.

[5] Plaintiffs also devote considerable attention to developing facts concerning the degree to which the three officers were either concealed or covered, but to the extent they maintain that Sgt. Dussault could not see any of the three officers, it would appear that the level of protection offered to those officers by trees, electrical service boxes, or anything else, is not a material fact. Obviously, Sgt. Dussault cannot be charged with knowledge of what he could not see.

not aim his gun at Sgt. Dussault or any of the officers in the woods, and did not intend to fire his gun.[6]  Just before his gun fired, Michael raised his left arm only, and raised it no higher than his waist.[7]  When Michael did shoot, the round went into the ground as much as twenty feet in front of Officer Gandia and twenty feet to his left.

As a result of the events described above, Michael was charged with attempted murder, criminal threatening, and reckless conduct.  The indictment for reckless conduct recites, in pertinent part:

> Michael Jaques . . . on or about September 16, 1997, at Londonderry in the County of Rockingham, with force and arms, did commit the crime of Reckless Conduct RSA

---

[6] While plaintiffs insist that Michael did not shoot intentionally, and that Officer Gandia perceived Michael's shot to be aimless, Michael's intent is immaterial, for reasons given below, and in any event, defendants' legal position does not depend upon Michael's intent, and defendants do not dispute that issue.  There was, to be sure, conflicting testimony at Michael's criminal trial regarding whether he had one hand or two on the gun, and regarding how high he raised it, but such conflicting testimony does not constitute a factual dispute in this case, since defendants do not rely upon that aspect of Sgt. Dussault's trial testimony.

[7] Whether or not Michael raised one arm or two, and how high he raised the gun, may be genuine issues of fact, but for reasons explained below, they are not material.

631:3 in that he recklessly engaged in conduct which
placed another in danger of serious bodily injury.
Michael Jaques fired a handgun, a deadly weapon as
defined in RSA 625:11, V, in the direction of
Londonderry police officers . . . .

(App. to Pls.' Mem. of Law, Ex. 13.) After a trial in the Rockingham County Superior Court, Michael was found not guilty of attempted murder and the lesser included offense of attempted first degree assault. (Id., Ex. 15.) The jury deadlocked on the charges of criminal threatening (id., Ex. 14) and reckless conduct (id., Ex. 15), which resulted in a mistrial. Subsequently, the State nol prossed the criminal threatening charge (id., Ex. 13 at 2-3), and Michael pled guilty to the charge of reckless conduct (id. at 6).

Based upon the complaint, as modified by various concessions made by plaintiffs in their objection to defendants' motion for summary judgment,[8] this case currently consists of: (1) Count A,

---

[8] In plaintiffs' Memorandum of Law in Support of Plaintiffs' Objection to Motion for Summary Judgment, Mr. Jaques disclaims any participation as a plaintiff in his son's § 1983 claims (id. at 1-2), and assents to dismissal of Count G, his own claim for negligent infliction of emotional distress (id. at 2). Because Mr. Jaques has assented to dismissal of the only count to which he was a plaintiff, he is no longer a party to the case, and all remaining claims belong to Michael, referred to hereinafter as "plaintiff." For his part, Michael assents to dismissal of

10

a § 1983 excessive force claim against the Town and Chief Ryan, arising from the customs, policies, and practices of the Londonderry Police Department and the training the LPD gave its officers;[9] (2) Count B, a § 1983 excessive force claim against Sgt. Dussault, arising from the fact that he shot Michael and the way he supervised the officers under his command just prior to the shooting;[10] (3) Count E, a state law negligence claim against the Town, Chief Ryan, and Sgt. Dussault; (4) Count F, a state law claim for intentional infliction of emotional distress, asserted against all defendants; (5) Count H, a request for punitive damages under § 1983; and (6) Count I, a request under state law for enhanced compensatory damages. Plaintiffs also ask the court to order the Town to upgrade the training of its police officers and to acquire non-lethal weaponry to deal with suicidal persons.

---

Counts C and D (id.), as well as dismissal of Count E as to Officers Gandia and Slade (id.).

[9] Count A is grounded, in large measure, upon the LPD's failure to use non-lethal weapons, such as shotgun-propelled bean bags, to subdue Michael after he fired his gun in the direction of Officers Slade, Gandia, and LaDuke.

[10] Because plaintiff has abandoned Counts C and D, his excessive force claims against Officers Gandia and Slade (Mem. of Law Supp. Pls.' Obj. to Mot. Summ. J. at 2), there is no longer any basis for the supervisory liability component of Count B.

11

In addition to raising various defenses, defendants claim qualified immunity.

## Discussion

Defendants move for summary judgment on all remaining counts of plaintiff's complaint, arguing, inter alia, that: (1) Michael's constitutional rights were not violated because, under the circumstances, it was objectively reasonable for Sgt. Dussault to shoot him;[11] (2) Sgt. Dussault is entitled to qualified immunity; (3) plaintiff's supervisory liability claim is inadequately pled and also fails, due to the lack of an underlying constitutional violation; (4) plaintiff's municipal liability claim fails for a number of reasons, including the lack of an underlying constitutional violation; (5) plaintiff's negligence claim fails because the rule barring recovery for the suicide of another also bars recovery for failure to protect another from injuries resulting from his attempt to commit suicide and because the Town is protected by discretionary-

---

[11] In their argument that Sgt. Dussault's actions were objectively reasonable, defendants rely upon various theories of estoppel that give preclusive effect to Michael's conviction for reckless conduct.

function immunity; and (6) the claim for intentional infliction of emotional distress fails for lack of evidence of defendants' intent to inflict emotional distress on Michael.

Plaintiff counters that: (1) Michael's guilty plea to the charge of reckless conduct does not preclude him from litigating two issues, the reasonableness of Sgt. Dussault's belief that Michael might use deadly force, and whether Sgt. Dussault had a fear of the imminent use of deadly force;[12] (2) it was not

---

[12] Plaintiff agrees, as he must, that his guilty plea has some preclusive effect in this case.

> It is "beyond doubt" that issue preclusion applies to a federal civil rights action following a criminal conviction in state court. See Allen v. McCurry, 449 U.S. 90, 102 (1980); Glantz v. United States, 837 F.2d 23, 25 (1st Cir. 1988). . . . [F]ederal courts must give preclusive effect to judgments in state court whenever the courts of the particular state would do so, see Allen, 449 U.S. at 115-16 . . .

Napier v. Town of Windham, 187 F.3d 177, 184 (1st Cir. 1999) (parallel citations omitted). And in New Hampshire, "a prior criminal conviction has collateral estoppel effect in a subsequent civil proceeding as to the issues actually litigated and decided in the criminal case." Aubert v. Aubert, 129 N.H. 422, 428 (1987) (citing Hopps v. Utica Mut. Ins. Co., 127 N.H. 508, 511 (1985)). Accordingly, it is established in this case that Michael "recklessly . . . placed another in danger of serious bodily injury . . . [by] fir[ing] a handgun, a deadly weapon . . . in the direction of Londonderry police officers." For reasons explained below, the issue plaintiff claims not to have been established by Michael's guilty plea, i.e., Sgt.

13

objectively reasonable for Sgt. Dussault to open fire on Michael because Michael had committed no crime, was neither attempting to flee nor agitated, but was merely impaired, unresponsive, and non-threatening; (3) summary judgment should not be granted to Chief Ryan and the Town because Michael was directly harmed by their failure to approve the use of various non-lethal weapons necessary to implement the LPD's use-of-force policy, and because the LPD did not provide its officers with appropriate training for dealing with suicidal subjects; (4) his state law claims are not precluded because the duty of care owed by defendants to Michael overrides the rule against liability for the suicide of another and because the doctrine of discretionary-function immunity does not apply to the facts of this case.

Resolution of Michael's excessive force claim against Sgt. Dussault is dispositive of the entire case. Discussion begins, then, with a consideration of Count B, the § 1983 claim against Sgt. Dussault.[13] In order to prevail on a § 1983 claim, a

Dussault's subjective state of mind at the time he fired on Michael, is not material.

[13] And because Michael's constitutional rights were not violated, for reasons explained below, there is no need to reach

14

plaintiff must prove that one or more individual defendants, acting under color of state law, deprived him or her of a right, privilege, or immunity secured by the Constitution or laws of the United States.  See, e.g., Blessing v. Freestone, 520 U.S. 329, 340 (1997).  Michael claims that his rights, secured by the Fourth and Fourteenth Amendments to the United States Constitution, were violated when Sgt. Dussault shot him.  The court does not agree.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ."  U.S. Const. amend. IV. The Fourth Amendment right to security against unreasonable seizures of the person includes the right to be free from the use of excessive force by law enforcement officers "in the course of an arrest, investigatory stop, or other 'seizure' . . ."  Graham v. Connor, 490 U.S. 386, 395 (1989) (holding that § 1983

the question of qualified immunity.  See Saucier v. Katz, 533 U.S. 194, 201 (2001) ("If no constitutional right would be violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); Duriex-Gauthier v. Lopez-Nieves, 274 F.3d 4, 9 (1st Cir. 2001) (citing County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998); Siegert v. Gilley, 500 U.S. 226, 232 (1991)).

15

excessive force claims "should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach").  As for the specific contours of a person's right to be free from the use of excessive force:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake.  [Tennessee v. Garner, 471 U.S. 1,] 8 [(1985)], quoting United States v. Place, 462 U.S. 696, 703 (1983).  Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.  See Terry v. Ohio, 392 U.S. [1,] 22-27 [(1968)].  Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.  See Tennessee v. Garner, 471 U.S., at 8-9 (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure")

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  See Terry v. Ohio, supra, at 20-22.  The

16

Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, <u>Hill v. California</u>, 401 U.S. 797 (1971), nor by the mistaken execution of a valid search warrant on the wrong premises, <u>Maryland v. Garrison</u>, 480 U.S. 79 (1987).  With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," <u>Johnson v. Glick</u>, 481 F.2d [1028,] 1033 [(1973)], violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  See <u>Scott v. United States</u>, 436 U.S. 128, 137-139 (1978); see also <u>Terry v. Ohio</u>, supra, at 21 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard").

<u>Graham</u>, 490 U.S. at 396-97.


In this circuit, "the constitutional standard for evaluating § 1983 causes of action based upon the use of deadly force," <u>Napier</u>, 187 F.3d at 183, provides:

17

> [T]he Supreme Court's standard of reasonableness is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present.
>
> . . .
>
> [W]hether substantive liability or qualified immunity is at issue, the Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases. . . . And in close cases, a jury does not automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently.

Roy v. Inhabitants of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994) (affirming summary judgment for § 1983 defendant police officer who shot drunken suspect who kicked and lunged at the officer while flailing his arms and holding two steak knives).

Based upon the foregoing legal principles and the facts of this case, viewed in the light most favorable to plaintiff, no reasonable jury could conclude that Sgt. Dussault violated Michael's rights under the Fourth Amendment. In other words, the strongest case plaintiff could make (but one the court rejects) would be this:

18

> [p]erhaps a jury could rationally [find] that [Sgt.
> Dussault] could have done a better job; but; . . . a
> jury could not find that his conduct was so deficient
> that no reasonable officer could have made the same
> choice as [Sgt. Dussault] – in circumstances that were
> assuredly "tense, uncertain, and rapidly evolving . . .
> ." Graham, 490 U.S. at 397.  Put differently, [Sgt.
> Dussault's] actions, even if mistaken, were not
> unconstitutional.

Roy, 42 F.3d at 695-96 (parallel citation omitted).  Here,

however, Sgt. Dussault acted rationally and reasonably to protect

his fellow officers, the public, and himself, under trying and

threatening circumstances.

The proper legal inquiry is whether Sgt. Dussault's actions

were objectively reasonable in view of the circumstances

confronting him.  See Graham, 490 U.S. at 397 (citations

omitted).  Such an inquiry necessarily excludes much of what

plaintiff seeks to establish at trial, including: (1) factual

matters beyond the scope of Sgt. Dussault's perception and

knowledge, such as whether or not Officer Gandia was protected by

an electrical service box (which, of course, could offer precious

little protection from a bullet); and (2) Sgt. Dussault's state

of mind.  In short, resolution of this case turns on whether Sgt.

Dussault's actions fell within the range of what a reasonable

19

police officer would have done, under the same circumstances, given the information that Sgt. Dussault had. If Sgt. Dussault's actions were objectively reasonable, then what he or any other officer actually believed about the danger they were in, and the actual likelihood that Michael would shoot again, are immaterial.

At the time he shot Michael, Sgt. Dussault knew that Michael was armed, had refused to give up his gun, and had repeatedly failed to comply with numerous commands to lie down and give himself up. He also knew that he had ordered Officers Slade, Gandia, and LaDuke to follow him and Michael toward the intersection of Windsor and Bretton, and he knew that all three were off in the woods to Michael's right. He knew Officer Gandia's position to within ten yards. He knew that Michael fired his weapon in the direction of the officers in the woods. He knew that one of the officers in the woods returned fire. And he knew that the first shot of return fire did not hit Michael. None of these facts are in dispute.

Once Michael fired his deadly weapon in the direction of the officers to his right, it was reasonable for Sgt. Dussault to

20

protect those officers by firing on Michael.  See Napier, 187 F.3d at 186-88 (affirming district court's grant of summary judgment in favor of § 1983 defendants when two police officers fired seven shots at mentally unstable armed suspect who pointed a gun at one of them, but did not fire).  Whether any or all of the three officers in the woods were partially concealed or covered – an issue developed at great length by plaintiff – is immaterial.  Because of the darkness, Sgt. Dussault had no way of knowing how well protected the officers were, if at all, and it is Sgt. Dussault's perception of the situation rather than the actual conditions in the woods that must be analyzed to determine the reasonableness of Sgt. Dussault's actions.  See Napier, 187 F.3d at 182-83 ("The Fourth Amendment inquiry in excessive force cases asks whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them.") (citing Graham, 490 U.S. at 397).

Given the government's compelling interest in protecting police officers and the public from deadly force, and in light of Sgt. Dussault's knowledge of his officers' general positions coupled with his inability to see them, no jury could find it

21

unreasonable that Sgt. Dussault concluded that Michael's gunshot, and the continuing threat of deadly force he posed, placed the other officers at grave risk.[14]  Moreover, before he fired on Michael, Sgt. Dussault heard one of the officers in the woods return fire, confirming that that officer, at least, felt himself to be at risk.

On the facts of this case, it would be absurd for a jury to conclude that Sgt. Dussault's return of fire to protect the officers in the woods was unreasonable.  He was hardly required, before returning fire, to perform a painstaking analysis of the various areas of factual dispute identified by plaintiff, including: (1) the officers' precise positions and the degree to which they were covered or concealed;[15] (2) the angle of

_____

[14] While plaintiff makes much of his own lack of injurious intent, and Officer Gandia's impression that Michael fired his gun aimlessly (an impression which, of course, Sgt. Dussault could not have known about at the time), it was perfectly reasonable for Sgt. Dussault to consider Michael a threat to the officers in the woods.  A person shooting aimlessly into a populated area who has refused to relinquish his weapon may not be quite as great a threat as an unimpaired intentional shooter, but even without aiming, a person firing a gun in the direction of three others poses an obvious, substantial, and deadly threat.

[15] In view of the "fairly wide zone of protection" given to police decision making in situations such as this, Roy, 42 F.3d at 695, the court cannot agree with the proposition, seemingly

22

Michael's shot and whether it was intentional or accidental; (3) whether or not Michael had more rounds in his pistol; (4) Michael's knowledge of the officers' positions and his ability to see them; (5) the extent to which Michael's emotional and chemical impairment rendered him unable to identify or hit a target with a potential second or third or sixth shot; and (6) the reliability of Officer Gandia's decision to return fire as an indication that he was in actual danger. To the contrary, once Michael fired in the direction of the officers in the woods, and after the first shot of return fire failed to bring Michael down, it was objectively reasonable for Sgt. Dussault to open fire on Michael for the purpose of taking him into custody and abating the threat he posed.

Finally, plaintiff's arguments about Sgt. Dussault's stress-induced inability to accurately perceive the situation

---

advanced by plaintiff, that before he could fire, Sgt. Dussault needed proof positive that one or more of the officers in the trees did not have protective cover. Rather, in the rapidly developing and deadly situation faced by Sgt. Dussault, in which he could not see the other officers due to darkness, it was entirely reasonable for him to act on the presumptions that: (1) one or more of the officers was not protected by cover; and (2) even if cover was available, the officers were nevertheless in grave danger.

23

confronting him are also immaterial, because whatever Sgt. Dussault's perceptual abilities may have been, the actions he took constituted an objectively reasonable response to the situation that confronted him, even when considered in the light most favorable to plaintiff. See Graham, 490 U.S. at 397 (explaining that officers' actions are to be judged against a standard of objective reasonableness, without regard to the officer's state of mind). In other words, persons in Michael's position have a constitutional right to have only an amount of force that is reasonable used against them, but they do not enjoy a constitutional right to be confronted only by police officers who are impervious to the pressures inherent in dangerous unpredictable situations such as the one created by Michael's refusal to follow Sgt. Dussault's reasonable and often-repeated commands.

Finally, the applicable standard of objective reasonableness, as applied to the actions taken by a police officer, makes immaterial various fact questions left unresolved by Michael's guilty plea, such as "the issues of imminent force or the reasonableness of the beliefs or fears of Lt. Dussault

24

relative to the use of deadly force by Michael" (Mem. of Law Supp. Pls.' Obj. to Mot. Summ. J. at 21). The proper inquiry is not, as plaintiff would have it, into the reasonableness of the beliefs or perceptions that led Sgt. Dussault to act; the inquiry is into the objective reasonableness of the action Sgt. Dussault took.

## Conclusion

For the reasons given above, as to that portion of Count B asserting that Sgt. Dussault violated Michael's constitutional rights by shooting him, defendants' motion for summary judgment is granted. As the court noted in footnote ten, supra, Michael's assent to dismissal of Counts C and D also entails dismissal of that portion of Count B asserting a claim of supervisory liability. In any event, because there is no underlying constitutional violation, there can be no claim for supervisory liability. See Nieves v. McSweeney, 241 F.3d 46, 50 (1st Cir. 2001) (citing Martinez v. Colon, 54 F.3d 980, 990 (1st Cir. 1995) (affirming summary judgment for defendant, on a supervisory liability claim, because police officer who shot fellow officer during episode of horseplay did not violate constitutional rights

25

of the officer he shot)).  The lack of an underlying constitutional violation similarly dooms Michael's municipal liability claims in Count A.  See Nieves, 241 F.3d at 50 (citing Evans v. Avery, 100 F.3d 1033, 1040) (1st Cir. 1996) (affirming summary judgment for defendant, on a municipal liability claim, because police officers who struck plaintiff during car chase did not violate her constitutional rights)).

The counts remaining in this case assert two state law claims – negligence and intentional infliction of emotional distress.  Given that this case is "at an early stage in the litigation," Camelio v. American Federation, 137 F.3d 666, 672 (1st Cir. 1998) (citing Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1177 (1st Cir. 1995)), and in the interest of comity, see Camelio, 137 F.3d at 672 (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)), the court declines to exercise supplemental jurisdiction over the state law claims in Counts E and F.  Those claims are dismissed without prejudice.

Defendants' motion for summary judgment (document no. 22) is granted.  The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

June 17, 2002

cc:  Andru H. Volinsky, Esq.
     Donald E. Gardner, Esq.

27