# United States Court of Appeals
## For the First Circuit

No. 17-1952

UNITED STATES OF AMERICA,

Appellee,

v.

DENZEL CHISHOLM, a/k/a Den, a/k/a Din,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Thompson, Kayatta, and Barron,
Circuit Judges.

---

Jin-Ho King, with whom Leonard E. Milligan III and Milligan Rona Duran & King LLC were on brief, for appellant.
Alexia R. De Vincentis, Assistant Attorney General, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellee.

---

October 8, 2019

---

**THOMPSON**, <u>Circuit Judge</u>.

**OVERVIEW**

Of the seventeen people indicted in this drug case, fifteen pled guilty and two stood trial together — the two being Denzel Chisholm and Molly London. At the trial's end, the jury convicted Chisholm of a variety of offenses, including conspiring to possess heroin with intent to distribute, plus possessing and distributing heroin (these counts of conviction also charged aiding-and-abetting liability) — though the jury acquitted him of being a felon in possession of a firearm. The jury also found that prosecutors proved beyond a reasonable doubt that the conspiracy involved 1 kilogram or more of heroin and that this amount "was attributable to and reasonably foreseeable" to him — to establish that number, prosecutors relied on evidence from controlled buys,[1] non-controlled seizures, intercepted communications, surveillance, and cooperating witnesses. As for London, the jury convicted her of maintaining an apartment for storing and distributing heroin, plus possessing and distributing heroin (the last count of conviction charged aiding-and-abetting liability as

_____

[1] A controlled buy is when a confidential informant or undercover agent uses money from the government to buy drugs as part of an investigation. <u>See, e.g.</u>, <u>United States</u> v. <u>Jordon</u>, 999 F.2d 11, 12-13 (1st Cir. 1993).

well).  And the district judge later handed out prison sentences of 342 months to Chisholm, and 20 months to London.

Only Chisholm's appeal is before us.[2]  And he challenges both his convictions and sentence.  On the convictions front, he contends that the judge slipped by denying two mistrial motions — the first based on the judge's allowing a government witness to retake the stand and recant some trial testimony, and the second based on London's supposedly offering a defense prejudicially antagonistic to his own.  On the sentencing front, he claims that the judge substantively erred by imposing a sentence beyond what Congress intended for the type of drug transactions that went down.  The government thinks that nothing here rises to the level of reversible error.  We do too and affirm.

**MISTRIAL-DENIAL CLAIMS**

**Background**

The salient events are not disputed (buckle in, because we have a lot of ground to cover — even though we recount only what is needed to understand the issues on appeal).

During pretrial discussions about evidentiary issues that might arise if London chose to testify, London's lawyer told the judge that her defense would be that "she was unaware of

---

[2] London moved to withdraw her appeal, which we granted.

- 3 -

[Chisholm's] activity in [her] house." Asked by the judge if she planned on "pointing [her] finger . . . at Chisholm as [a] bad guy," London's lawyer replied that her "defense is that she was being taken advantage of; she was betrayed by her best friend who used her." That is an "issue," the judge said. And then the judge asked how things could be "fix[ed] . . . if she takes the stand and points a finger at Chisholm." London's counsel clarified that London "can't say that she knew" the heroin "was Chisholm's because she didn't know it existed there." And given how counsel "rephrased it," the judge saw no need to sever Chisholm from London for trial. Neither did Chisholm's lawyer.

Jumping to opening statements at trial, we see that the prosecutor told the jury that "Chisholm was the leader of the largest heroin-trafficking organization on Cape Cod." He and "his childhood friends, Christopher Wilkins and Christian Chapman[,] . . . pooled money to buy large quantities of pure heroin, which they divided among themselves and sold to their respective customers" — all while "stor[ing] their heroin and their drug-trafficking tools at various residences," including London's. The prosecutor then explained that four categories of evidence would seal Chisholm's and London's fate: drug-dealer testimony, like from "Ricky Serriello"; law-enforcement testimony "describing their investigation"; recorded calls and videos made by another

cooperating dealer; and "physical evidence" seized from Chisholm's and London's homes.

Chisholm's lawyer told the jury in his opening that "[i]t's true that [Chisholm] and friends and people he grew up with were drug dealers." So, he added, "what this trial is really about is the weight and scope of the conspiracy." Counsel then painted a picture of "a group of childhood friends who . . . became small street-level drug dealers" — apparently in an attempt to cast doubt on the amount of heroin properly attributed to him.

In her opening, London's lawyer told the jury that "Molly London had no idea that Denzel Chisholm was selling drugs," because "[h]e took pains to hide his conduct from Molly." London had no clue that Chisholm hid heroin in her house, counsel later stressed, "because [he] took advantage and betrayed her trust over and over again." Chisholm's attorney did not object to London's lawyer's opening statement.

The government then called its first witness, Serriello. Asked "[w]ho supplied you with the heroin you were caught with," he responded, "I don't really remember." He also claimed that he did not remember testifying before the grand jury, speaking with law-enforcement agents, or giving a proffer outlining his anticipated testimony. Confronted with a copy of his grand-jury testimony, Serriello said that "[m]aybe [he] was high or

- 5 -

something," because he "d[idn't] remember saying any of this." Asked specifically about his grand-jury statement that Chisholm had supplied the heroin, he stated, "The Denzel Chisholm I know isn't in this courtroom right now."

Chisholm's lawyer requested a sidebar conference. Talking with counsel, the judge told them that Serriello and Chisholm "nodded to each other" as they (counsel) were heading toward the bench. "It's clear," the judge added, "that either someone got to [Serriello] or he's terrified." After excusing the jury, the judge asked Serriello — in Chisholm's presence — if anyone had threatened him. "No," he replied. Chisholm's lawyer then questioned Serriello and confirmed that Chisholm had not threatened him. And the judge confirmed that his testimony was that "there is a human being named Denzel Chisholm who sold [Serriello] drugs, but it isn't the guy here." Weighing in, the prosecutor said that Serriello was "clearly perjuring himself," because "[h]e spoke with us yesterday" and had identified Chisholm by photograph. And "[h]e'll probably be indicted for perjury."

The next morning, the judge revealed at sidebar that Serriello's lawyer had said that "there was a threat to kill Mr. Serriello's child." Over Chisholm's counsel's objection, the judge said that she would conduct an *ex parte* hearing with Serriello and his attorney during a break in the trial.

- 6 -

The government then put Stephanie Davis on the stand. A onetime conspiracy member turned government cooperator, Davis called Chisholm "the biggest drug dealer" she knew. For a time, Chisholm and Wilkins came to her apartment once a week with 10 to 30 grams of raw heroin, which they would "cut" (*i.e.*, make less pure) and press into "bricks" containing "a couple of hundred grams" of finished product. Davis also testified that Chisholm sold heroin knowing that it caused people to overdose.

Chisholm's counsel attacked Davis's credibility on cross-examination — focusing, for example, on how she "was a drug dealer in this group of drug dealers" and had failed a drug test just a few months earlier. As for London's lawyer, she got Davis to agree that a "core" group of drug dealers, a "triad," had worked together here — Chisholm, Chapman, and Wilkins. "[T]hey were the big players[,] . . . the ones that you regularly interacted with," London's attorney said, to which Davis responded, "Yes." And when London's counsel asked if "within that circle, there were other people [—] either individuals that ran stash houses, addicts who would use and then sell to use, or sell to use and profit [—] underneath them," Davis answered, "Uh-huh."

After Davis left the stand, Chisholm's lawyer objected, saying that "in a pretrial hearing, we were very clear about evidentiary limits on Ms. London's eventual defense" and that

- 7 -

"we're treading awfully close to the issues we . . . discussed." The judge opted to defer ruling on that issue, however. And then she held the *ex parte* hearing with Serriello and his lawyer.

About a half-hour later, the judge reported back that Serriello had said that he had gotten some threats involving his daughter from third parties (he did not get names, though). And he was afraid something might happen to him in prison. He also explained that he became nervous on the stand after hearing a clicking sound, as if someone in the courtroom had taken his picture — which is why he had testified the way he did. But he now wanted to testify again.

Chisholm's attorney objected to any ruling allowing the government to recall Serriello, saying "[t]here's vast prejudice to [Chisholm]" if the judge let Serriello rehabilitate himself by testifying "that he was intimidated into not testifying" the first time. But the judge indicated that she would let prosecutors put Serriello back on the stand and ask one or two questions about the reason for his changed testimony — though they could not mention that the threat involved his daughter, because that info was too prejudicial. Chisholm's lawyer asked for a mistrial, arguing that there was "zero evidence of [his client's] participation" in the threats, yet the jury would have "no choice but . . . to infer that [he] procured that." Implicitly denying the motion, the judge

said that she would instruct the jury "that there's no evidence" that any threat "was done at [Chisholm's] request."

On the stand a second time, Serriello testified that he had lied the day before because he perceived a threat from a "third party." He also fingered Chisholm as his main dealer, from whom he had gotten the 400 grams of heroin found on him when arrested. And he said that he had bought heroin from Chisholm for about a year, at one point buying 500 grams on a weekly basis. Cross-examined by Chisholm's lawyer, he admitted that he had not seen or heard from Chisholm since his (Serriello's) arrest; that he was not saying that Chisholm had threatened him; and that law-enforcement agents had reminded him "in a roundabout way" that testifying falsely put his plea deal in jeopardy.

The following morning, Chisholm's attorney filed a mistrial motion. In his accompanying memo, counsel wrote that Serriello's recall testimony suggested to the jury that "Chisholm, someone at his command, or someone seeking to assist him threatened . . . Serriello for taking the stand against . . . Chisholm" — which among other things might lead the jury to conclude "that a conspiracy exists because the third-party who threatened . . . Serriello must have some arrangement . . . to try helping [Chisholm]." Also according to counsel, Serriello's testimony was so highly prejudicial as to be incurable by any instructions from

the judge.  Shifting focus, counsel then argued that "London's opening statement and cross-examinations exceed[ed] the scope of the parties and the [judge's] understanding of . . . London's defense."  "Chisholm did not insist on separate trials," counsel noted, "because he expected . . . London's trial defense to be one of lack of knowledge"; but London ended up "point[ing] a finger " at him and "us[ing] the term 'triad[,]'" a word "linked to organized crime" — all of which "unduly" prejudiced him.

The judge did not want to rule from the bench, however.  But she did give the jury a limiting instruction, explaining that Serriello's testimony about a "perceived threat"

> can only be used to assess the credibility of . . . Serriello, whether you believe him or not why he changed his testimony.  You cannot use that in any way against . . . either of the defendants, but in particular . . . Chisholm, because there's no evidence he made that.

Prosecutors continued parading witnesses and presenting physical evidence (recorded audio and video, pages of text messages, *etc.*) against Chisholm and London.  And they also filed a multifaceted objection to Chisholm's mistrial motion.  For starters, they pointed out that Serriello admitted on the "stand that he was not accusing . . . Chisholm of threatening him."  And given the government's evidence — involving, for example, many cooperators, calls and text messages, police surveillance, and controlled heroin buys — Chisholm cannot show that "one witness'[s]

testimony" (from the very first witness to testify) "so taint[ed] the jury as to mandate a mistrial." As for Chisholm's problem with London's strategy, prosecutors spotted no troubling antagonism, seeing how he "conceded his involvement in drug trafficking" and his "defense in no way hinges" on the notion that she knew about "his drug trafficking." Turning to London's lawyer's use of "triad," prosecutors saw no need for a mistrial — yes, the word can "refer to Chinese organized crime groups in certain contexts"; but the word has many meanings, including "a union or group of three" (or so their argument went).

London's lawyer argued to the judge that she had been "very transparent" that London's defense would be that London did not know heroin was in her apartment or who put it there. But, counsel continued, "the evidence is overwhelming that the only logical person who could have put it there would have been [Chisholm]."

Taking up Chisholm's motion, the judge said that she had never heard "triad" used "in connection with a gang." And she denied his mistrial request for the reasons stated in the government's memo.

Throughout all this, London's lawyer's cross-examinations generally focused on how the witnesses did not know London or if they did, how they had done their drug business at

her house outside her presence. Her lawyer also questioned ATF Special Agent Christopher Kefalas about locations Chisholm used to cut and stash heroin — all in the hopes of drawing a distinction between Chisholm's need to coordinate access to London's home and what counsel suggested was Chisholm's unfettered access to these other houses.[3] And in her direct and cross-examinations, London testified that she never saw anything in her home that made her think that anyone was buying or selling heroin there.

Turning to closing arguments (and we're only hitting the highlights), we note that the prosecutor told the jury that it "should be very skeptical of what Mr. Serriello had to tell you" and "shouldn't take his word without highly corroborating evidence." "But here," the prosecutor said, "we have that," pointing to the evidence gathered by criminal investigators. And about the recall testimony, the prosecutor just said that Serriello "explained the reason for his lies, and I think the evidence shows that he was telling the truth."

Chisholm's lawyer's closing argument portrayed his client as a man who owned no house, car, or jewelry and had less than 10 grand in cash — hardly the profile of a bigtime drug

---

[3] "ATF" is an acronym commonly used for the Bureau of Alcohol, Tobacco, Firearms and Explosives.

dealer.    And he insisted that government's case rested on exaggerations and untruths.

Repeating her opening statement a bit, London's attorney's closing argument focused on the deception theme. Chisholm, her lawyer said, "used [London's] friendship, her kindness, and he preyed on her gullibility, and he did it with a false commitment of friendship . . ., a deception used by a highly skilled drug dealer." Counsel also emphasized the "huge difference between the real members who were operating stash houses and Molly London." And when Chisholm's attorney moved for a mistrial based on the closing, the judge responded at sidebar, "Let me just say, I keep denying it because you can see that he's a drug trafficker."

The prosecutor's rebuttal argument emphasized that Chisholm was "a wide-scale heroin dealer" who "didn't hide himself from [London]."

Which brings us to today, with Chisholm again saying that he deserved a mistrial because Serriello's recall "threat" testimony "created an inescapable inference that unfairly inculpated" him (Chisholm) in the drug conspiracy, and because London's "antagonistic" shift in her defense prejudiced him by undercutting his ability to muster a proper defense. The government thinks otherwise, arguing that the "adverse" inference Chisholm believes the jury would draw from Serriello's recall

- 13 -

testimony was "not so compelling," and that "the tension between his defense and London's was not so severe," as to make "the jury impervious" to the judge's instructions about "the limited purpose for which it could consider Serriello's testimony about the threat" and its duty "to consider separately the evidence against each defendant."

**Standard of Review**

Ordering a mistrial is a last-resort remedy, "only to be implemented if the taint is ineradicable, that is, only if the trial judge believes the jury's exposure to the [complained of] evidence is likely to prove beyond realistic hope of repair." United States v. Sepulveda, 15 F.3d 1161, 1184 (1st Cir. 1993). And we review a district judge's denial of a mistrial motion only for "manifest abuse of discretion," because she is in the best position to decide if an incident is sufficiently serious to justify the drastic step of terminating a trial. See, e.g., United States v. DeCologero, 530 F.3d 36, 52 (1st Cir. 2008) (emphasizing that district judges are "better enable[d] . . . to strike the delicate balance between fending off prejudice, on the one hand, and husbanding judicial resources, on the other hand" (internal quotation marks omitted)). Which is why "it is only rarely — and in extremely compelling circumstances — that [we], informed by a cold record, will venture to reverse a trial judge's on-the-spot

- 14 -

decision" that the interests of justice do not require aborting an ongoing trial.  United States v. Georgiadis, 819 F.3d 4, 16 (1st Cir. 2016) (quoting United States v. Freeman, 208 F.3d 332, 339 (1st Cir. 2000)); accord United States v. Butterworth, 511 F.3d 71, 76 (1st Cir. 2007).

**Analysis**

*Serriello's Recall Testimony*

First up is Chisholm's claim that the judge should have granted a mistrial after Serriello retook the stand and testified about the threat he had received.[4]  Let's put to one side that Serriello explicitly said that Chisholm did *not* threaten him.  See generally United States v. Pérez-Montañez, 202 F.3d 434, 439 (1st Cir. 2000) (finding evidence about a threat admissible to show a witness's "motivation for having changed his version of events").  Like the government, we think the prejudicial inference he complains about — that the jury would have speculated either that

---

[4] Although framed as a challenge to the mistrial denial, Chisholm sprinkles into his briefing some cites to Rules of Evidence 403 and 404(b) — generally speaking, Rule 403 excludes probative evidence that is substantially outweighed by its prejudicial effect, and Rule 404(b) bars evidence of a defendant's other offenses to show that his actions conformed to his bad character.  See, e.g., United States v. Rivera-Carrasquillo, 933 F.3d 33, 46 (1st Cir. 2019).  But whether viewed as an error in admitting evidence or in denying a mistrial, the standard of review is abuse of discretion.  See United States v. Dunbar, 553 F.3d 48, 59 (1st Cir. 2009); United States v. Bradshaw, 281 F.3d 278, 284 (1st Cir. 2002).

- 15 -

he made the threat because he was guilty as charged and wanted to avoid getting convicted or that he "inhabited a sufficiently important role within the drug-trafficking organization to obtain such dramatic intervention" — is not so strong as to defy repair short of a mistrial.

For one thing, the record contains no evidence of any violence by Chisholm to support the suggestion that the threat came from him — the jury found him not guilty of a firearms charge, and the jury's discriminating verdict shows that Serriello's recall testimony did not (as Chisholm claims) "serve[] as an unspoken appeal to fears of gang violence" and "drug trafficking organizations."  For another thing, the threat could have come from anyone, including a family member, a friend, or a coconspirator.  And given the thinness of the alleged prejudicial inference, the judge's telling the jury not to use Serriello's perceived-threat testimony against Chisholm or London "was the right course" under our caselaw.  See Butterworth, 511 F.3d at 76.

Butterworth devastates Chisholm's argument.  There, a cooperating coconspirator in a drug case claimed (incorrectly, apparently) that he was testifying in exchange for government protection.  Id.  Defendant Butterworth moved for a mistrial, arguing that the statement implied that he had threatened the witness.  Id.  The district judge denied the motion.  Id.  We

- 16 -

affirmed, calling the prejudicial inference "thin[]," because "there was no evidence of violence by Butterworth elsewhere in the trial and any threat could have come from a [drug] supplier," and noting that the judge had given a "swift and clear curative instruction" to the jury that "there is no evidence that . . . Butterworth has made any threats on the [cooperator's] life" and to "disregard the statement." Id.

Chisholm tries to distinguish Butterworth on the ground (emphasis ours) that "the evidence" there "merely *implied* the existence of a threat" while prosecutors here "*explicitly* put in evidence that someone threatened . . . Serriello into lying." Why this should make a difference escapes us. And that is because, given the government's alleged protection offer in Butterworth, a jury could have easily concluded that someone there had (as here) threatened the cooperator into lying — a situation that required *no* mistrial, for the reasons just discussed.[5]

---

[5] Pulling out all the stops, Chisholm also calls Serriello's "live testimony" unnecessarily "cumulative." As support, he points to a recorded statement where he talked to a "Darren Pelland" about selling Serriello like a "half a brick" a week. But we agree with the government that Serriello's testimony helped corroborate Chisholm's recorded statement (a statement that Chisholm's lawyer tried to pass off below as mere puffery) — meaning the cumulative-evidence claim is also a no-go.

- 17 -

Ultimately, then, the judge's denial of Chisholm's mistrial motion based on Serriello's recall testimony passes abuse-of-discretion review.

*London's Defense Strategy*

Next up is Chisholm's claim that the judge should have granted a mistrial because London's switch in trial tactics made their defenses "irreconcilably antagonistic," demonstrating a risk of prejudice that required a mid-trial severance. The government completely disagrees, asserting that any "tension" between their defenses "was not so severe" as to make his trial unfair. Again, we side with the government.

Defendants indicted together ordinarily may be tried together. See, e.g., Zafiro v. United States, 506 U.S. 534, 537 (1993). That a defendant thinks his chances for acquittal would be better in a separate trial is not enough to order a mid-trial severance or a mistrial. See id. at 540. Neither remedy is required just because the defendants have "mutually antagonistic or irreconcilable defenses," see id. at 538 — "[f]inger-pointing among the defendants," for instance, "is not only acceptable but also a benefit of a joint trial, for it helps the jury to assess the role of each defendant," see United States v. Hoover, 246 F.3d 1054, 1061 (7th Cir. 2001). Rather, to justify the "extraordinary measure" of a mid-trial severance, a defendant must show that the

joint trial caused him such compelling prejudice that he was robbed of a fair trial, see United States v. Sotomayor-Vázquez, 249 F.3d 1, 17 (1st Cir. 2001) (quotation marks omitted) — like when "the antagonism [is] such that if the jury believes one defendant, it is *compelled* to convict the other defendant," see United States v. Floyd, 740 F.3d 22, 36 (1st Cir. 2014) (quotation marks omitted); see also Zafiro, 506 U.S. at 539-41.  This is a very high bar. See Sotomayor-Vázquez, 249 F.3d at 17.  And it is one that Chisholm cannot clear.

The gist of London's defense — and what she testified to — was that she did not know Chisholm sold heroin.  Chisholm does not claim that this aspect of her defense is prejudicially antagonistic.  Nor could he.  What he argues is that her lawyer's suggestion — pushed in opening statements, cross-examining witnesses, and closing arguments — that he "was a large-scale, sophisticated heroin trafficker" made her defense prejudicially antagonistic to his.  But the problem for him is that the jury could believe — or (as it did here) disbelieve — both London's claim of ignorance and Chisholm's denial of the conspiracy's existence and scope:  she claimed no knowledge of his drug-dealing activity (on whatever scale), and so whether he dealt in large quantities was peripheral to her defense.

On top of that, courts measure "the level of antagonism . . . by the *evidence* actually introduced at trial." United States v. Rose, 104 F.3d 1408, 1416 (1st Cir. 1997) (emphasis added). And "argument by counsel is not" — repeat, *not* — "evidence." Id.; accord United States v. Tiem Trinh, 665 F.3d 1, 18 (1st Cir. 2011). Which takes care of Chisholm's arguments based on counsel's opening and closing statements.

As for Chisholm's arguments based on counsel's cross-examination questions, the testimony elicited merely echoed the evidence already introduced by the government. For instance, before testifying on cross that Chisholm was among the "big players" that she "regularly interacted with," Davis testified on direct that Chisholm (working with Wilkins and Chapman) visited her home weekly to cut and bag vast amounts of heroin, used her and others' homes as stash houses, and used her and others to sell drugs. Also, the distinction counsel tried to draw when cross-examining Special Agent Kefalas (between Chisholm's access to other stash houses and London's house) was premised on already-admitted evidence that Chisholm used others' homes to hide drugs. And by essentially being "a reaffirmation" of the prosecution witnesses' direct testimony — "neither adding to, nor subtracting from," the prosecution's "case" — the complained-of cross does not help Chisholm's claim. See United States v. Peña-Lora, 225 F.3d

- 20 -

17, 34 (1st Cir. 2000) (quotation marks omitted); see also United States v. Tejeda, 481 F.3d 44, 55-56 (1st Cir. 2007) (holding that even though the defendant denied being the conspiracy's drug source and a codefendant identified him as a drug supplier, the defenses were not so antagonistic as to require a mid-trial severance, because the codefendant's testimony was "cumulative" of other testimony).

What is more, limiting instructions are usually sufficient antidotes to potential prejudice. See Zafiro, 506 U.S. at 539 (explaining that even "[w]hen the risk of prejudice is high," a judge can take other measures short of severance, like offering "limiting instructions," which "often will suffice to cure any risk of prejudice"). And here, the judge cautioned jurors that counsel's contentions are not evidence. She also said that the government had to prove each defendant's guilt beyond a reasonable doubt, and so jurors could not "think of the defendants as a group" but had "to give separate consideration to the case against each defendant." Staying with that theme, she later told them that they had to "separately consider the evidence against each defendant on each count and return a separate verdict with respect to each defendant." That these instructions sufficed to dispel any risk of prejudice is confirmed by the fact that they essentially mimic those deemed sufficient in Zafiro.

The Zafiro defendants had mutually antagonistic defenses: Gloria Zafiro said she had no idea that a suitcase Jose Martinez (her boyfriend) kept in her apartment had drugs; Martinez said he had no idea that Zafiro was involved in selling drugs. 506 U.S. at 536. The defendants sought severance, claiming (among other things) that the jury would believe only one defense and so would find the other guilty regardless of whether the prosecution had proved its case beyond a reasonable doubt. Id. at 540. The Supreme Court found no need for severance, noting that the following instructions cured any possibility of prejudice: the prosecution had "the burden of proving beyond a reasonable doubt" that each defendant committed the charged crimes; the jury had to "give separate consideration to each individual defendant and to each separate charge against him"; "[e]ach defendant is entitled to have his or her case determined from his or her own conduct and from the evidence [that] may be applicable to him or her"; and opening and closing statements are not evidence. Id. at 541.

We presume that juries follow instructions about potentially prejudicial evidence — until and unless "there is an 'overwhelming probability' that the instruction[s] will be ineffectual." Blake v. Pellegrino, 329 F.3d 43, 50 (1st Cir. 2003) (quoting Richardson v. Marsh, 481 U.S. 200, 208 (1987)); see also

- 22 -

<u>Sepulveda</u>, 15 F.3d at 1184. Chisholm has not made any such showing, however.

The bottom line is that the judge's denial of Chisholm's mistrial motion based on London's defense strategy survives abuse-of-discretion scrutiny.

**SUBSTANTIVE-REASONABLENESS CLAIM**

**Background**

Congress established "a three-tiered type-and-quantity-driven sentencing regime" for narcotics-law violations. <u>See</u> <u>United States</u> v. <u>Eirby</u>, 515 F.3d 31, 32-33 (1st Cir. 2008). Take heroin, the drug at issue here: the most severe tier sets a minimum term sentence of 10 years and a maximum of life for covered offenses involving "1 kilogram or more," <u>see</u> 21 U.S.C. § 841(b)(1)(A); the next most severe tier sets a minimum prison term of 5 years and a maximum of 40 years for covered offenses involving "100 grams or more," <u>see</u> <u>id.</u> § 841(b)(1)(B); and the least severe tier sets a maximum prison term of 20 years for covered offenses involving less than 100 grams (it has no mandatory minimum), <u>see</u> <u>id.</u> § 841(b)(1)(C). These ranges differ if death or serious injury resulted from the drug's use, or if the defendant already had a predicate conviction under his belt. <u>See</u> <u>id.</u> §§ 841(b)(1)(A)-(C), 851.

As we noted in this opinion's opening paragraph, the jury found beyond a reasonable doubt that the amount of heroin attributable or reasonably foreseeable to Chisholm was 1 kilogram or more. And as we just said, that amount typically carries a minimum penalty of 10 years in prison. But a prior felony-drug conviction of his doubled the minimum to 20 years, as no one disputes.[6]

At sentencing, Chisholm conceded responsibility for trafficking 2.227 kilograms of heroin, a number based on the controlled buys, the seizures, the intercepted calls, and the surveillance. That number corresponds to a base offense level of 30. See USSG § 2D1.1(c)(5) (noting that the base offense level for at least 1 kilogram but less than 3 kilograms of heroin is 30).[7] After making arguments not relevant here, Chisholm insisted

---

[6] The First Step Act of 2018 changed the minimum from 20 years to 15 years. See Pub. L. No. 115-391, § 401, 132 Stat. 5194 (2018) (amending 21 U.S.C. § 841(b)(1)(A)(viii)). But because Chisholm makes no First Step Act-based arguments, we say nothing else about that provision.

[7] For anyone in need of a quick sentencing primer:

Sentencing under the federal sentencing guidelines starts with the base offense level — i.e., a point score for a specified offense or group of offenses. The guidelines then make adjustments for any aggravating or mitigating factors in the defendant's case, thus arriving at a total offense level. The guidelines also assign points based on the defendant's criminal history — points that get converted into various criminal history categories, designated by Roman numerals I through VI. Armed with this info, the judge turns to

that he had a guidelines sentencing range of 324 months (23 years) to 405 months (33.75 years).  And he ultimately asked for the mandatory-minimum sentence of 20 years.

The government, contrastingly, contended that the judge had to add to the 2.227-kilogram figure the multiple kilograms that the cooperating witnesses had pinned on Chisholm — which, when done, would make him responsible for at least 3 kilograms of heroin and put him at a base offense level of 32.  See id. § 2D1.1(c)(4) (noting that the base offense level for at least 3 kilograms but less than 10 kilograms of heroin is 32).  The government also argued that he had a sentencing range of 360 months (33 years) to life.  And the government requested a 35-year term.

Expressing unease about using any cooperator's uncorroborated testimony, the judge zeroed in on Chisholm's recorded comment to Pelland about selling Serriello a "half a brick" a week (a comment mentioned in footnote 5).  And the judge

---

the guidelines's sentencing table.  And by plotting the defendant's total offense level along the table's vertical axis and his criminal history category along the table's horizontal axis, the judge ends up with an advisory prison range.  From there, the judge sees if any departures are called for, considers various sentencing factors, and determines what sentence (whether within, above, or below the suggested range) seems appropriate.

United States v. Martínez-Benítez, 914 F.3d 1, 2 n.2 (1st Cir. 2019) (citations omitted).

found that even if Chisholm had exaggerated a little about sale frequency, and even if each sale involved only 200 grams (an amount referenced by an agent at sentencing), he "clearly" sold heroin "multiple times, and [that] gets [Chisholm] over 3" kilograms. So the judge fixed his base offense level at 32, made various adjustments not pertinent here, set his total offense level at 41, and placed him in criminal history category III — which resulted in a sentencing range of 360 months to life. And after weighing the relevant sentencing factors, the judge settled on a term of 360 months (30 years) — which the judge adjusted downward to 342 months (28.5 years) to account for the time Chisholm had already served on a related state charge.

Chisholm concedes to us that the judge calculated the correct guidelines sentencing range, admitting (as he must) that the guidelines let judges aggregate drug quantities for sentencing purposes. See USSG § 2D1.1 cmt. n.5 (noting that "[i]f the offense involved both a substantive drug offense and an attempt or conspiracy (*e.g.*, sale of five grams of heroin and attempt to sell an additional ten grams of heroin), the total quantity involved shall be aggregated to determine the scale of the offense"). But he insists that the judge should have used her discretion to sentence him more in line with the penalty range set out in § 841(b)(1)(B) for persons convicted of offenses involving more

than 100 grams but less than 1 kilogram of heroin. And he bases his claim on the following multi-step argument:

A. He asserts that the controlling statutes talk about "a violation" of the narcotics law — "distribut[ion] . . . or possess[ion] with intent to . . . distribute . . . a controlled substance," see 21 U.S.C. §§ 841(b)(1)(A) (emphasis added), 841(a)(1) — as well as conspiracy to do the same, see id. § 846. Pointing to United States v. Zuleta-Molina, 840 F.2d 157 (1st Cir. 1988) (per curiam), he contends that "[t]he unit of prosecution" for § 841 "is transactional — not aggregation based." So, in his view, the aggregation of multiple transactions — each of which he says is a separate violation — clashes with the drug laws' plain language.

B. Then he suggests that the statutes' legislative history indicates that Congress divided traffickers into three tiers, from highest to lowest rank: "manufacturers or the heads of organizations"; "managers of the retail[-]level traffic, the person[s] . . . filling the bags of heroin . . . and doing so in substantial street quantities"; and everyone below the retail-level managers. See H.R. Rep. No. 99-845, pt. 1, at 12, 17 (1986). And he intimates that one is a manufacturer or head if he deals 1 or more kilograms of heroin, while one

- 27 -

is a retail-level manager if he deals "100 grams [to] 1 kilogram" of heroin.

C. From there he insists that the government offered "no credible evidence" that he participated "in a single transaction of one kilogram or more" — thus making him at most "a retail-level manager," putting him in the "100 grams [to] 1 kilogram" level for punishment purposes, which he says warrants a base offense level of 24. See USSG § 2D1.1(8) (noting that at least 100 grams but less than 400 grams of heroin yields a base offense level of 24).

D. And by not using her discretion to impose a sentence that jibes more with that level — remember, she found him responsible for 3 kilograms or more of heroin, which corresponds to a base offense level of 32 — the judge imposed an overly harsh sentence, amounting to substantive unreasonability (he believes that she should have given him 20 years, not 30 (reduced to 28.5)).

The government, for its part, defends the judge's sentencing decision to the hilt. Among other points, the government argues that the guidelines require aggregation. And, the government adds, the judge's sentencing discretion clearly includes the power to follow them. More, the government says that "[i]t is unclear" how Chisholm's "transaction-based" theory makes

- 28 -

the guidelines's "use of aggregated quantities infirm" in the conspiracy context. The government also stresses that Chisholm "regularly distributed large quantities of a deadly drug," obviously aware "of its dangers." So the government asserts that the sentence was not unjustifiably severe.

## Standard of Review

A sentence is substantively unreasonable "only if it falls beyond the expansive 'universe of reasonable sentencing outcomes.'" United States v. Rodríguez-Torres, No. 16-1507, 2019 WL 4463275, at *20 (1st Cir. Sept. 18, 2019) (quoting United States v. Bermúdez-Meléndez, 827 F.3d 160, 167 (1st Cir. 2016)). And we review the substantive reasonableness of the judge's sentence for abuse of discretion, knowing that a sentence must stand if she gave a plausible explanation and reached a defensible result. See, e.g., United States v. Tanco-Pizarro, 892 F.3d 472, 483-84 (1st Cir. 2018).

## Analysis

We find several problems with Chisholm's argument. For openers, his step-A complaint about aggregation rings hollow, given how he conceded at sentencing to having distributed 2.227 kilograms of heroin — a number that could only be reached *through aggregation*. And unfortunately for him, the Federal Reporter is full of our opinions saying that "[a]n appellant cannot change

- 29 -

horses in mid-stream, arguing one theory below and a quite different theory on appeal."[8]  See Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010).

This concern aside, Chisholm's argument also rests on a mistake about conspiracy law.  A conspiracy is an agreement to commit some other crime, see United States v. Shabani, 513 U.S. 10, 16 (1994) — though it "may, and often does, encompass an array of substantive illegal acts carried out in furtherance of the overall scheme," see United States v. Pressley, 469 F.3d 63, 65 (2d Cir. 2006) (per curiam) (citing United States v. Broce, 488 U.S. 563, 570-71 (1989), and Braverman v. United States, 317 U.S. 49, 53-54 (1942)).  And for a drug conspiracy — the essence of which is an agreement to violate the narcotics laws — "these subsidiary crimes may take the form of a series of smaller drug sales."  See Pressley, 469 F.3d at 65.

So because "[a] conspiracy . . . is a single offense," see United States v. Manjarrez, 306 F.3d 1175, 1181 (1st Cir. 2002), it "constitutes 'a violation'" for § 841(b) purposes, see Pressley, 469 F.3d at 66 (quoted language taken from the statute). And in sentencing a narcotics-conspiracy member under § 841(b),

---

[8] While we are on the topic of changing horses, Chisholm pushed for a base offense level of 30 in the district court but now suggests that level should be 24 — an effort that also runs headlong into Ahern.

the offense involves the aggregate of all drugs "attributable to[] or reasonably foreseeable by" him.  See United States v. Walker-Couvertier, 860 F.3d 1, 17 (1st Cir. 2017) (quoting United States v. Cintrón-Echautegui, 604 F.3d 1, 5 (1st Cir. 2010)); see also United States v. Dunston, 851 F.3d 91, 100 (1st Cir. 2017); Pressley, 469 F.3d at 66.

Nor does Zuleta-Molina save his "transactional — not aggregation based" theory.  True, that case held that § 841's "language . . . unequivocally indicates that the government may prosecute each individual act of distribution."  See 840 F.2d at 158.  But the indictment there charged the defendant with substantive § 841 offenses, not conspiracy.  See id. at 157.  And "[g]iven the conceptional distinction between conspiratorial and substantive liability," nothing in Zuleta-Molina reflects an attempt "to insulate drug conspirators from the long-standing rule treating a conspiracy as a single, unified violation."  See Pressley, 469 F.3d at 66.

As for Chisholm's step-B attempt to seek refuge in legislative history — recall his talking about "manufacturers or heads of organizations"; "managers of the retail[-]level traffic;" etc. — we note that even for those who find legislative history relevant, the history he plays up is anything but.  This is so because we are not faced with unclear statutory language.  See,

e.g., Milner v. Dep't of the Navy, 562 U.S. 562, 574 (2011) (explaining that "[l]egislative history, for those who take it into account, is meant to clear up ambiguity, not create it"); United States v. Gonzales, 520 U.S. 1, 6 (1997) (declaring that where statutory language is plain, "there is no reason to resort to legislative history"); Gemsco, Inc. v. Walling, 324 U.S. 244, 260 (1945) (holding that "[t]he plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction"). And this is also so because, for reasons just given, applying the statutory language produces no patently absurd result. See, e.g., INS v. Cardoza-Fonseca, 480 U.S. 421, 452 (1987) (Scalia, J., concurring) (emphasizing that "if the language of a statute is clear, that language must be given effect . . . at least in the absence of a patent absurdity").

If more were needed — and it isn't — Chisholm's step-B and step-C thoughts about how he should be viewed more like a retail-level manager for sentencing purposes are not difference-makers either. He dug that label out of legislative history, recall, as he did the manufacturer-or-head-of-organization label; neither label appears in 21 U.S.C. § 841(b) or in USSG § 2D1.1(c) — which rely on drug quantities, not malleable titles. And we

- 32 -

just explained why we need not resort to legislative history. But even if the labels mattered for our analysis, and even if a retail-level manger corresponded to the "100 grams [to] 1 kilogram tier" (a claim he makes without pointing to controlling authority), he would still lose, because his taking responsibility for 2.227 kilograms of heroin blows a huge hole in his theory.

The net result is nothing Chisholm says convinces us that his sentence is implausible or indefensible. And by not offering us a persuasive basis to override the judge's exercise of her discretion, he gets no sentencing do-over.

**ENDING**

Having worked our way through Chisholm's issues, we *affirm* the challenged convictions and sentence.